# Supreme Court of Florida

_____

No. SC18-1368
_____

**KENNETH J. DETZNER, etc.,**
Appellant,

vs.

**LEAGUE OF WOMEN VOTERS OF FLORIDA, et al.,**
Appellees.

October 15, 2018

PER CURIAM.

Appellant, Kenneth Detzner, Secretary of the Florida Department of State, seeks review of *League of Women Voters of Florida, Inc. v. Detzner*, No. 2018-CA-001523 (Fla. 2d Cir. Aug. 20, 2018). The circuit court granted summary judgment in favor of the League of Women Voters (LWV) and enjoined Detzner from placing Revision 8 on the ballot for the November 2018 general election. Detzner appealed the decision to the First District Court of Appeal, which certified to this Court that the judgment is of great public importance and requires immediate resolution by this Court. We have jurisdiction. *See* art. V, § 3(b)(5), Fla. Const.

This Court considered this cause at oral argument on September 5, 2018, and on September 7, 2018, issued an order affirming the decision of the circuit court. This opinion provides the reasons for our decision.

## Background

Article XI, section 2, of the Florida Constitution establishes the Constitution Revision Commission (CRC) to convene every twenty years to propose revisions to the Florida Constitution. *See* Art. XI, § 2, Fla. Const. Then, the proposed constitutional amendment must be "submitted to the electors at the next general election." Art. XI, § 5(a), Fla. Const.

On March 21, 2018, the Constitution Revision Commission (CRC), approved Proposal 71, which would have made the following revision to Article IX, Section 4(b):

> (b) The school board shall operate, control, and supervise all free public schools established by ~~within~~ the school district and determine the rate of school district taxes within the limits prescribed herein. Two or more school districts may operate and finance joint educational programs.

The sponsor of the proposal stated during debate that the revision was intended to overrule *Duval County School Board v. State Board of Education*, 998 So. 2d 641 (Fla. 1st DCA 2008), and to allow the power to authorize new charter schools to be assigned to any of a variety of potential public or private entities.

The CRC combined Proposal 71 with Proposal 43 and Proposal 10, which also included changes to Article IX of the Florida Constitution. Later, the language was revised to read:

> (b) The school board shall operate, control, and supervise all free public schools <u>established by the district school board</u> within the school district and determine the rate of school district taxes within the limits prescribed herein. Two or more school districts may operate and finance joint educational programs.

A motion to unbundle the three proposals was unsuccessful.

The CRC drafted and approved the following title and summary for inclusion on the ballot:

CONSTITUTIONAL AMENDMENT

ARTICLE IX, SECTION 4, NEW SECTION

ARTICLE XII, NEW SECTION

SCHOOL BOARD TERM LIMITS AND DUTIES; PUBLIC SCHOOLS.—Creates a term limit of eight consecutive years for school board members and requires the legislature to provide for the promotion of civic literacy in public schools. Currently, district school boards have a constitutional duty to operate, control, and supervise all public schools. The amendment maintains a school board's duties to public schools it establishes, but permits the state to operate, control, and supervise public schools not established by the school board.

On July 12, 2018, LWV filed a complaint seeking to enjoin Detzner, in his capacity as Secretary of State, from placing Revision 8 to the Florida Constitution on the November 2018 general election ballot. LWV argued that the revision could not be lawfully submitted to Florida voters because the ballot title and

summary fail to inform voters of the chief purpose of the revision and are affirmatively misleading as to the true purpose and effect of the revision. The parties agreed to an expedited procedure through cross-motions for summary judgment, the trial court heard arguments on August 17, 2018, and, on August 20, 2018, granted summary judgment in favor of LWV and denied Detzner's motion.

In its order granting summary judgment to LWV, the circuit court determined that the ballot summary "invents a category of school . . . undefined in Florida law." Therefore, the court reasoned, "both the text and the summary are entirely unclear as to which schools will be affected by the revision." "The failure to use the term voters would understand, 'charter schools,' as well as the use of a phrase that has no established meaning under Florida law, fails to inform voters of the chief purpose and effect of this proposal." The court found that the deficiencies here were similar to those discussed in *Florida Department of State v. Florida State Conference of NAACP Branches*, 43 So. 3d 662 (Fla. 2010), stating, "[N]owhere does the ballot summary inform the voter of the essential role school boards play in authorizing new schools, and nowhere does the language inform the voter that this role is intended to be diluted by Revision 8."

Additionally, the circuit court determined that the title was misleading through omission, stating that "the vague reference to 'school board . . . duties' is

- 4 -

presumably intended to allude to Proposal 71[1] [but] a voter could easily believe . . . that it consists solely of a proposal to limit the term limits for school boards." The circuit court also found the ballot summary affirmatively misleading, stating that it "is conspicuously silent about who or what would undertake these responsibilities for schools not established by the school board." In conclusion, the circuit court found:

> Because the ballot summary for Revision 8 clearly and conclusively fails to adequately inform the voter of the chief purposes and effects of the revision, and is affirmatively misleading, placement of Revision 8 on the ballot would violate Article XI, Section 5, Florida Constitution, and Section 101.161(1), Florida Statutes.

On August 20, 2018, Detzner filed a notice of appeal with the First District Court of Appeal. On August 22, 2018, the First District certified the case for pass-through jurisdiction, finding that the appeal involves a question of great public importance that requires immediate resolution by this Court.

**Standard of Review**

Section 101.161(1), Florida Statutes (2018), is a "codification of the accuracy requirement implicit in article XI, section 5 of the Florida Constitution." *Advisory Op. to Att'y Gen. re Referenda Required for*

---

1. Proposal 71 refers to the CRC proposal restricting the duties of the district school boards that was one of three proposals included in Revision 8.

*Adoption & Amendment Local Gov't Comprehensive Land Use Plans*, 902

So. 2d 763, 770 (Fla. 2005).  Section 101.161(1) provides:

> Whenever a constitutional amendment or other public measure is submitted to the vote of the people, a ballot summary of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates, followed by the word "yes" and also by the word "no," and shall be styled in such a manner that a "yes" vote will indicate approval of the proposal and a "no" vote will indicate rejection.  The ballot summary of the amendment or other public measure and the ballot title to appear on the ballot shall be embodied in the constitutional revision commission proposal, constitutional convention proposal, taxation and budget reform commission proposal, or enabling resolution or ordinance.  The ballot summary of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. In addition, for every amendment proposed by initiative, the ballot shall include, following the ballot summary, a separate financial impact statement concerning the measure prepared by the Financial Impact Estimating Conference in accordance with s. 100.371(5).  The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.  This subsection does not apply to constitutional amendments or revisions proposed by joint resolution.

§ 101.161(1), Fla. Stat. (2018).  "Implicit in this provision is the requirement

that the proposed amendment be *accurately* represented on the ballot;

otherwise, voter approval would be a nullity." *Armstrong v. Harris*, 773 So.

2d 7, 12 (Fla. 2000).  The accuracy requirement in article XI, section 5,

functions as truth-in-packaging law for the ballot. *Id.* at 13.  The accuracy

requirement applies to all proposed constitutional amendments. *Id.* at 16.

We have explained "that the ballot [must] be fair and advise the voter

sufficiently to enable him intelligently to cast his ballot." *Askew v. Firestone*, 421 So. 2d 151, 155 (Fla. 1982) (quoting *Hill v. Milander*, 72 So. 2d 796, 798 (Fla. 1954)). While the ballot title and summary must state in clear and unambiguous language the chief purpose of the measure, they need not explain every detail or ramification of the proposed amendment. *Carroll v. Firestone*, 497 So. 2d 1204, 1206 (Fla. 1986). The ballot must, however, give the voter fair notice of the decision he or she must make. *Armstrong*, 773 So. 2d at 15 ("Although the ballot summary faithfully tracked the text of the proposed amendment, the summary failed to explain that the amendment would supersede an already existing constitutional provision . . . ."). The purpose of section 101.161 is to ensure that voters are advised of the amendment's true meaning. *Advisory Op. to Att'y Gen. re Indep. Nonpartisan Comm'n to Apportion Legislative & Cong. Dists. Which Replaces Apportionment by Legislature*, 926 So. 2d 1218, 1228 (Fla. 2006).

> A court may declare a proposed constitutional amendment invalid only if the record shows that the proposal is clearly and conclusively defective; the standard of review [in such cases] is de novo. Proposed amendments to the Florida Constitution may originate in any of several sources, including the Legislature, revision commission, citizen initiative, or constitutional convention. Regardless of source, a proposed amendment ultimately must be submitted to the electors for approval at the next general election.

*Armstrong*, 773 So. 2d at 11 (footnotes omitted).

The accuracy requirement in article XI, section 5, imposes a strict minimum standard for ballot clarity. This requirement plays no favorites—it applies across-the-board to *all* constitutional amendments . . . . The purpose of this requirement is above reproach—it is to ensure that each voter will cast a ballot based on the *full* truth. To function effectively—and to remain viable—a constitutional democracy must require no less.

*Id.* at 21.

We have stressed that a proposed amendment "must stand on its own merits and not be disguised as something else." *Askew*, 421 So. 2d at 156. "A ballot title and summary cannot either 'fly under false colors' or 'hide the ball' as to the amendment's true effect." *Armstrong*, 773 So. 2d at 16. In assessing the ballot title and summary for compliance with section 101.161(1), the reviewing court should ask two questions: first, whether the ballot title and summary "fairly inform the voter of the chief purpose of the amendment," and second, "whether the language of the title and summary, as written, misleads the public." *Advisory Op. to Atty. Gen. re Fla. Marriage Protection Amendment*, 926 So. 2d 1229, 1236 (Fla. 2006). However, this Court does not consider the substantive merit of the proposed amendment. *Dep't of State v. Slough*, 992 So. 2d 142, 147 (Fla. 2008).

The title and summary must also be accurate and informative. *See Advisory Opinion to the Att'y Gen. re Term Limits Pledge*, 718 So. 2d 798, 803 (Fla. 1998). These requirements make certain that the "electorate is advised of the true meaning, and ramifications, of an amendment." *Advisory Opinion to the Attorney*

- 8 -

*Gen. re Tax Limitation*, 644 So. 2d 486, 490 (Fla. 1994) (quoting *Askew*, 421 So. 2d at 156). A proposed amendment must be removed from the ballot when the summary does not accurately describe the scope of the text of the amendment, because it has failed in its purpose. *See Term Limits Pledge*, 718 So. 2d at 804.

Finally, we have held that the ballot title and summary must be read together in determining whether the ballot information properly informs the voters. *See Advisory Opinion to the Att'y Gen. re Voluntary Universal Pre-Kindergarten Educ.*, 824 So. 2d 161, 166 (Fla. 2002). This Court will presume that the average voter has a certain amount of common understanding and knowledge. *See Advisory Op. to Att'y Gen. re Protect People from the Health Hazards of Second-Hand Smoke*, 814 So. 2d 415 (Fla. 2002).

**Analysis**

This case presents two issues for our consideration: (1) whether Revision 8's ballot title and summary is clearly and conclusively defective because it fails to inform voters of its effect and (2) whether the ballot title and summary are misleading. We conclude that because the ballot summary fails to include a clear statement of the chief purpose of the revision and fails to inform voters of its true meaning and ramifications, the ballot language is defective. That the ballot summary is unclear is best demonstrated by the proponents of the proposed

revision, who each give different meaning to the language of the revision, its title, and its summary. We therefore affirm the decision of the circuit court.

Since 1998, the Florida Constitution has provided, "Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education . . . ." Art. IX, § 1(a), Fla. Const. Also since then, section 4 has provided:

> SECTION 4. School districts; school boards.—
> (a) Each county shall constitute a school district; provided, two or more contiguous counties, upon vote of the electors of each county pursuant to law, may be combined into one school district. In each school district there shall be a school board composed of five or more members chosen by vote of the electors in a nonpartisan election for appropriately staggered terms of four years, as provided by law.
> (b) The school board shall operate, control and supervise all free public schools within the school district and determine the rate of school district taxes within the limits prescribed herein. Two or more school districts may operate and finance joint educational programs.

In relevant part, the most recent CRC proposed the following revision to section 4(b) to be included on the ballot in the November 2018 general election:

> (b) The school board shall operate, control, and supervise all free public schools established by the district school board within the school district and determine the rate of school district taxes within the limits prescribed herein. Two or more school districts may operate and finance joint educational programs.

Because section 101.161(1) requires a ballot summary to state "the chief purpose" of the proposed amendment, we look to objective criteria, like the amendments' main effect to determine whether a ballot summary complies with

- 10 -

the statute.  *Armstrong*, 773 So. 2d at 18.  Here, the ballot summary provides, "Currently, district school boards have a constitutional duty to operate, control, and supervise all public schools.  The amendment maintains a school board's duties to public schools it establishes, but permits the state to operate, control, and supervise public schools not established by the school board."

While the ballot summary informs voters that district school boards will no longer have the authority to operate, control, and supervise public schools that they do not establish, the summary fails to explain who or what, other than district school boards, currently has the authority to establish public schools, which categories of public schools will be affected, and who or what will have the authority to establish future public schools if voters approve the revision.  Failure to explain this key component of the revision is exacerbated by the fact that the phrase "established by" is not one that is consistently used in Florida Statutes, when addressing public schools.  *Compare* § 1002.32, Fla. Stat. (2018) ("establish[ing] a category of public schools to be known as developmental research (laboratory) schools (lab schools)"), *with* § 1002.33, Fla. Stat. (2018) (explaining how a charter school may be "formed").  Because it is a phrase that is neither commonly nor consistently used, it cannot be commonly understood by voters.

Further, the ballot summary fails to explain which public schools or categories of schools will be affected. Currently, in addition to the general provision for K-12 education in section 1003.02, Florida Statutes (2018), providing that schools boards "must establish, organize, and operate their public K-12 schools and educational programs," the Florida Statutes provide for five additional public schools or categories of public schools.[2] It is entirely unclear from both the

2. One of these categories and one of these schools is said to be "established" by the statutory provision and one additional school is "created." The public schools and categories of public schools specified in the Florida Statutes are as follows:

1. Development research (laboratory) schools. § 1002.32, Fla. Stat. (2018). "There is *established* a category of public schools to be known as developmental research (laboratory) schools (lab schools)." § 1002.32(2), Fla. Stat. (2018) (emphasis added).

2. Charter schools. § 1002.33, Fla. Stat. (2018). "All charter schools in Florida are public schools and shall be part of the state's program of public education. A charter school may be formed by creating a new school or converting an existing public school to charter status." § 1002.33(1), Fla. Stat. (2018).

3. New World School of the Arts. § 1002.35, Fla. Stat. (2018). "The New World School of the Arts is *created* as a center of excellence for the performing and visual arts, to serve all of the State of Florida." § 1002.35(1), Fla. Stat. (2018) (emphasis added).

4. Florida School for the Deaf and the Blind. § 1002.36, Fla. Stat. (2018).

5. Florida Virtual School. § 1002.37, Fla. Stat. "The Florida Virtual School is *established* for the development and delivery of online and distance learning education." § 1002.37(1)(a), Fla. Stat. (2018) (emphasis added).

- 12 -

text of the amendment and the ballot language which of these public schools, or categories of public schools, would be affected. Therefore, the problem "lies not with what the summary says, but, rather, with what it does not say." *Askew*, 421 So. 2d at 156. Because voters will simply not be able to understand the true meaning and ramifications of the revision, the ballot language is clearly and conclusively defective.

That the voters will not be informed as to the true meaning and ramifications of the revision is evinced by the varying explanations offered by the proponents. For example, Detzner argues that local school boards have no constitutional authority to establish or authorize public schools and asserts that the revision would not change the status quo. Meanwhile, the Florida Consortium of Public Charter Schools and Florida Charter School Alliance, as amici curiae, argue that the proposed revision would affect all public schools. Further, they argue that the proposed revision serves to "eliminate the constitutional barrier to school choice." On the other hand, the Urban League of Miami and the Central Florida Urban League, amici curiae, argue that Revision 8 presents a much needed change by stripping the local school boards of their ability to continue their hostility towards public charter schools.

Because proponents of the proposed revision each give different meaning to the "clear and unambiguous" language of the revision, its title, and its summary,

logic dictates that the language is neither clear nor unambiguous. Accordingly, the voters cannot be said to have fair and sufficient notice to intelligently cast his or her vote.

In *Duval County School Board v. State Board of Education*, 998 So. 2d 641 (Fla. 1st DCA 2008), the First District found that section 1002.335, Florida Statutes (2006), was facially unconstitutional. The Legislature, in 2006, enacted section 1002.335 to create the "Florida Schools of Excellence Commission" as an independent body with the power to authorize charter schools throughout the State of Florida. *Id.* at 642. Prior to its enactment, the First District held, "only district school boards could authorize charter schools." *Id.* Under the statute, district school boards had to seek approval from the State Board of Education to exercise that power. Relying on this Court's reasoning in its decision in *Bush v. Holmes*, 919 So. 2d 392, 398 (Fla. 2006), the First District found that the statute removed constitutional authority from the school boards and relegated them to essentially ministerial functions. Accordingly, the First District found that section 1002.335 "pose[d] a present total and fatal conflict with article IX, section 4 of the Florida Constitution." *Duval Cty.*, 998 So. 2d at 644.

The decision in *Duval County* demonstrates that, as currently interpreted, the Florida Constitution provides that only district school boards may authorize charter schools. *Id.* at 642. *Duval County* belies Detzner's argument that the Legislature

currently has that authority and that the Revision does not alter the status quo.

Therefore, it appears that the circuit court correctly determined that the ballot title

and summary fly under false colors.  As stated by this Court in *Armstrong*, it is not

sufficient for a ballot summary to faithfully track the text of a proposed

amendment, *Armstrong*, 773 So. 2d at 15, a proposed amendment "must stand on

its own merits and not be disguised as something else."  *Askew*, 421 So. 2d at 156.

"A ballot title and summary cannot either 'fly under false colors' or 'hide the ball'

as to the amendment's true effect."  *Armstrong*, 773 So. 2d at 16.

As demonstrated by the arguments of the Revision 8 proponents, this

language either does nothing or changes everything.  Considered within the context

of the Constitution as a whole, which provides for a State Board of Education that

regulates public education at the state level, and the Florida Statutes, which

provide five distinct types of public schools, the ballot title and summary to

Revision 8 do not ensure that the "electorate is advised of the true meaning, and

ramifications, of [the] amendment." *Advisory Opinion to the Attorney Gen. re Tax

Limitation*, 644 So. 2d at 490 (quoting *Askew*, 421 So. 2d at 156).

**Conclusion**

For the foregoing reasons, we previously affirmed the judgment of the

circuit court enjoining Detzner from placing Revision 8 on the ballot for the

November 2018 general election. No motion for rehearing will be entertained.

- 15 -

It is so ordered.

PARIENTE, LEWIS, QUINCE, and LABARGA, JJ., concur.
PARIENTE, J., concurs with an opinion, in which LEWIS, J., concurs.
LEWIS, J., concurs with an opinion.
CANADY, C.J., dissents with an opinion, in which POLSTON and LAWSON, JJ., concur.

PARIENTE, J., concurring.

I fully concur with the majority opinion. To be clear, our role at this stage is not to address the merits of the proposed constitutional amendment.[3] Rather, our role is to ensure that the ballot language accurately advises voters "of the true meaning, and ramifications, of an amendment." *Askew v. Firestone*, 421 So. 2d 151, 156 (Fla. 1982). Because the ballot title and summary for Revision 8 fail to explain to voters that approval of the amendment would significantly alter the ability of local district school boards to approve the establishment of free public schools within their district, specifically but not limited to charter schools, we had no choice but to strike the amendment from the ballot.[4]

---

3. *See Fla. Dep't of State v. Slough*, 992 So. 2d 142, 147 (Fla. 2008).

4. *See Roberts v. Doyle*, 43 So. 3d 654, 659 (Fla. 2010) ("A proposed amendment must be removed from the ballot when the title and summary do not accurately describe the scope of the text of the amendment, because it has failed in its purpose."); *Advisory Op. to Att'y Gen. re Term Limits Pledge*, 718 So. 2d 798, 804 (Fla. 1998) ("When the summary of a proposed amendment does not accurately describe the scope of the text of the amendment, it fails in its purpose and must be stricken.").

Article IX, section 4(b), of the Florida Constitution presently empowers local school boards with operating, controlling, and supervising "all free public schools within the school district." Art. IX, § 4(b), Fla. Const. Section 1003.02, Florida Statutes (2018), builds on this constitutional authority, stating that "district school boards must *establish*, organize, and operate their public K-12 schools." § 1003.02, Fla. Stat. (2018) (emphasis added). Public K-12 schools in Florida include, for example, charter schools. *Id.* § 1002.33(1). Currently, a charter school is not "created" until the district school board approves the application. *See* Fla. Dep't of Educ., *Frequently Asked Questions, How Are Charter Schools Created, Organized, and Operated?*, http://www.fldoe.org/schools/school-choice/charter-schools/charter-school-faqs.stml (last visited Sept. 29, 2018).

By limiting a district school board's authority to operate, control, and supervise to only those public schools it *establishes*, a somewhat indirect—but significant—limitation is also placed on the authority of district school boards to *establish*, or approve the creation of, public schools within their districts. It is this significant but undisclosed effect of the amendment that had the fervent support of charter school advocates. *See* Br. of Amici Curiae the Urban League of Miami & the Cent. Fla. Urban League, at 7 (explaining that the "ballot proposal was designed, in material part, to eliminate local school boards' virtual monopoly over new public schools").

- 17 -

Rather than advise voters of this critical change—which would have allowed a debate on the merits of centralized, uniform control of the establishment of charter schools—the ballot summary fails to explain the true effect of the amendment. In fact, the ballot summary disguises this monumental change to our state constitution by vaguely referring to school board "duties" and using terms that voters would not easily understand, such as "established by" and "not established by"—terms not previously used in the Florida Constitution.

It is true that a ballot summary need not "resolve all questions concerning its implementation." Dissenting op. at 32 (Canady, C.J.). But a change of this magnitude to the way public schools, including charter schools, are established throughout the state is not one that should be hidden from voters. This is particularly so when the change pertains to a subject that is of great importance to voters, such as public education.[5]

Interestingly, the initial version of this proposal clearly articulated the change sought. It would have added the following to article IX, section 4(b):

> Nothing herein may be construed to limit the legislature from creating alternative processes to authorize the establishment of charter schools within the state by general law.

_____

5. *See generally* Kyra Gurney & Kristen M. Clark, *Here's How the Controversial New Schools Law Will Impact South Florida*, Miami Herald (June 15, 2017), https://www.miamiherald.com/news/local/education/article156444609.html.

- 18 -

App'x Resp's Mot. for Summary J. at App'x 2. For whatever reason, the sponsor subsequently "filed a delete-all amendment" in the form ultimately approved by the Constitution Revision Commission (CRC), explaining that "the delete-all amendment [would] achieve the exact same outcome." CRC 2017-2018, transcript of meeting at 55 (Mar. 21, 2018).

The dissent complains that "[t]he people should not be prevented from making their own decision concerning the merits of the proposed amendment." Dissenting op. at 34-35 (Canady, C.J.). I agree. However, it is impossible for voters to make their own decision about the merits of the amendment when the ballot language fails to clearly explain the true effect of the proposal.

Finally, I agree with Justice Lewis that the manner in which Revision 8 was bundled would confuse voters as to its true purpose and effect. *See* concurring op. at 22 (Lewis, J.). Indeed, the positioning of the three separate proposals in the ballot summary added to the misleading nature of the amendment by explaining term limits and civic literacy before the ambiguous and cursory explanation of the change to the operation and establishment of free public schools. As the summary was written, voters would have been presented with "two . . . proposals that are popular and easily understood" before getting to the "vague but significant proposal" relegated to the end of the ballot summary. Br. of League of Women Voters, at 28.

Further, as CRC Commissioner Joyner argued in opposition to the bundling of the proposals, as a result of the bundling, voters who really wanted term limits and civic literacy would be forced "to give up control of [their] local schools." CRC 2017-2018, transcript of meeting at 163 (Apr. 16, 2018). She went on to explain:

> This gift to the charter school industry is cobbled — cobbled with School Board term limits and civics education to make it more palatable. Kind of like taking a spoonful of cod liver oil and figuring out how to make it easier to swallow.
> . . . .
> And at the end of the day, should you decide stripping local controls belongs in the State Constitution, why hitch it to anything? Why doesn't it stand alone?
> If it is so worthy and so good that it has your endorsement and your name behind it, then let this charter school measure stand on its own merit and let the people decide. Let it be local control. Let it be the people's vote.
> I can't support this [proposal]. The other measures, they're up for grabs. Term limits, civic literacy, they're appealing, but this one is the overriding game-changer that will forever make education different in the State of Florida because someone who has—some entity, no accountability to the people, they don't elect them, if we put this in the Constitution, we are giving away local control and our ability to have the major say in the education system of the State of Florida.

*Id.* at 180-83. Commissioner Martinez echoed this sentiment:

> But [this proposal] is a big deal. It is a game-changer. . . .
> The public should be entitled to vote on that issue. Let's debate the idea, up or down, as to whether or not they want [it], but don't put it together with civic literacy and term limits. They're just not related. They may be dealing with education generally, but they are very different parts of our educational system.

- 20 -

*Id.* at 178.

Although the CRC is not bound by a single-subject requirement, at least one CRC commissioner supported bundling the three separate proposals to "help" the other education-related proposals pass. *See* concurring op. at 22 (Lewis, J.). Combining popular and non-controversial proposals with a vaguely worded but ultimately controversial proposal is the very essence of logrolling. *See In re Advisory Op. to the Att'y Gen.*, 636 So. 2d 1336, 1339 (Fla. 1994) (explaining that logrolling is "a practice wherein several separate issues are rolled into a single initiative in order to aggregate votes or secure approval of an otherwise unpopular issue"). While nothing prevents the CRC from doing this, the CRC may not do so in a way that, as here, misleads voters as to the amendment's true effect.

For these reasons, I fully concur with the majority opinion striking the amendment from the November 2018 general election ballot.

LEWIS, J., concurs.

LEWIS, J., concurring.

I concur with the majority that Revision 8 should not be placed on the ballot for the November 2018 general election because it fails to clearly state the chief purpose of the revision and it fails to inform voters of its true meaning and ramifications. I also write separately because I believe that there is an additional reason Revision 8 must be stricken—namely, the proposed revision bundles

multiple issues into one amendment, which causes confusion and ambiguity as to the chief purpose of the proposal.

Revision 8 attempts to bundle three issues affecting the Florida public school system: (1) school board member term limits, (2) the Legislature's promotion of civic literacy in public schools, and (3) the State's ability to operate, control, and supervise public schools not established by the district school boards—i.e., charter schools, *see* per curiam op. at 10-14. While all three of these matters concern the public school system on a general level, each targets and affects very specific—and very different—issues within that public school system, which only serves to confuse and distract the public as to the revision's true purpose and effect. In fact, at the March 20, 2018, Constitution Revision Commission (CRC) Session, Revision 8's sponsor, Commissioner Gaetz, explicitly acknowledged that the bundling would "help some of those other education issues pass. I don't think you are going to get too many people in the state of Florida who are going to look at a ballot that says our children ought to be civically literate and say we are sure as heck against that." However, bundling controversial issues into an amendment containing a widely popular issue to trick the voters is precisely the type of misleading language expressly forbidden under section 101.161(1), Florida Statutes (2018).

This Court has from time immemorial warned against bundling multiple issues into one constitutional amendment due to the inherently misleading nature of combining multiple subjects and the problematic choice it requires voters to make. *See City of Coral Gables v. Gray*, 19 So. 2d 318, 322 (Fla. 1944) ("Yet, if required to vote upon the proposed amendment as presently framed the electors will be put to it to accept, or reject, all subject matters contained therein, in toto, without the opportunity for discrimination. . . . [T]he elector would be put in the position where, in order to aid in carrying a proposition which he considered good or wise, he would be obliged to vote for another which he would otherwise reject as bad or foolish. It would sanction the practice of combining meritorious and vicious legislation in one proposal, so that the former could not be secured without submitting to the latter."); *see also Antuono v. City of Tampa*, 99 So. 324, 326 (Fla. 1924). Nevertheless, the constitutional scheme under which the Court operated when announcing these warnings was vastly different than the one under which the Court today operates.

Currently, the Florida Constitution describes four procedures through which the Constitution can be amended or revised: (1) a joint resolution by the Legislature, Art. XI, § 1, Fla. Const., (2) a proposal by a constitution revision commission, Art. XI, § 2, Fla. Const., (3) a citizens' initiative process, Art. XI, § 3, Fla. Const., and (4) the establishment of a constitutional convention, Art. XI, § 4,

- 23 -

Fla. Const.  Out of these four procedures, only the citizens' initiative contains the restriction that a proposed amendment be limited to one subject.  Art. XI, § 3, Fla. Const.  As this Court has explained,

> It is apparent that the authors of article XI realized that the initiative method did not provide a filtering legislative process for the drafting of any specific proposed constitutional amendment or revision.  The legislative, revision commission, and constitutional convention processes of sections 1, 2 and 4 all afford an opportunity for public hearing and debate not only on the proposal itself *but also in the drafting of any constitutional proposal. That opportunity for input in the drafting of a proposal is not present under the initiative process and this is one of the reasons the initiative process is restricted to single-subject changes in the state constitution*.

*Fine v. Firestone*, 448 So. 2d 984, 988 (Fla. 1984) (emphasis added); *see also Charter Review Comm'n of Orange Cty. v. Scott*, 647 So. 2d 835, 837 (Fla. 1994) ("[O]ur state Constitution Revision Commission process . . . embodies a number of procedural safeguards that reduce the danger of logrolling and diminish the possibility of deception.").

The safeguards we announced allowing public input in the drafting of a constitutional amendment pursuant to sections 1, 2, and 4, however, do not foreclose the possibility that a proposed revision under one of these "safer" constitutional sections might nonetheless impermissibly bundle multiple unrelated issues into one general amendment.[6]  Within the context of article XI, section 2,

---

6. It is also worth noting that the safeguard enunciated in *Fine* was absent in this case.  Although the CRC did hold public hearings on each revision, these

- 24 -

the inquiry turns on whether the bundling of multiple issues within one amendment results in a misleading ballot summary and title. *Cty. of Volusia v. Detzner*, Fla. L. Weekly S355, S356 (Fla. Sept. 7, 2018) ("It follows that the bundling of measures creates a defect only if the measures are presented on the ballot in a misleading way."). As discussed by the majority at length, Revision 8's ballot summary language is defective, misleading, and unclear. *See* per curiam op. at 9. In addition to the already-ambiguous language contained within the ballot summary with regard to charter schools, muddling multiple subjects in this proposed revision makes it very difficult—if not impossible—for a voter to fully understand the chief purpose of the measure, as required by section 101.161(1).

A voter cannot intelligently cast his or her ballot if multiple issues of varying complexity and clarity are lumped together under one general amendment—especially when presented through defective ballot summary language. Instead, the bundling in Revision 8 results in voter confusion and serves to disguise the revision's true purpose and effect. *See Armstrong v. Harris*, 773 So. 2d 7, 16 (Fla. 2000) ("A ballot title and summary cannot either 'fly under false colors' or 'hide the ball' as to the amendment's true effect.").

---

hearings concluded before the CRC began drafting Revision 8, bundling the three individual issues under one proposal. Thus, the public was not afforded any input or opportunity to be heard during the drafting of the bundled revision.

For the foregoing reasons, I would strike Revision 8 from the November 2018 general election ballot due to the improper bundling, in addition to the reasons expressed within the majority opinion.

CANADY, C.J., dissenting.

Because I conclude that the appellees have failed to show that the ballot summary for Revision 8 is clearly and conclusively defective, I dissent from the majority's decision to strike this proposal from the ballot. The majority goes astray by invalidating the proposal on the basis of supposed deficiencies in the text of the proposed amendment itself. Under the standards required by our decisions, the ballot summary here correctly identifies the chief purpose of the proposed amendment. And the summary in no way either affirmatively misleads or misleads by omission. The people of Florida should have the opportunity to vote on this proposal to amend the Constitution.

The challenged portion of the ballot summary, which the majority declares to be defective, relates to a proposed change in article IX, section 4(b) regarding the scope of the duty (and concomitant authority) of school boards to "operate, control, and supervise" free public schools. This constitutional provision currently provides that each school board "shall operate, control and supervise all free public schools within the school district." The proposed amendment limits the scope of this provision to schools "established by the district school board." So under the

- 26 -

proposed amendment, each "school board shall operate, control, and supervise all free public schools *established by the district school board* within the school district." (Emphasis added.)

From this proposed change in the text of article IX, section 4(b), five unmistakable and interrelated points emerge. (1) Under the proposed amendment, constitutional room will exist not only for school-board-established schools but also for a category of free public schools that are *not* "established by the district school board." (2) The existing constitutional duty of school boards to "operate, control and supervise" all free public schools will be curtailed by the proposed amendment. (3) Under the proposed amendment, school boards will have the constitutional duty (and concomitant authority) to "operate, control, and supervise" the schools they establish. (4) School boards will not, however, have any such constitutional duty (and authority) regarding schools they do not establish. (5) Understood in the context of the "paramount duty of the state" regarding public education established in article IX, section 1, the "operat[ion], control, and supervis[ion]" of public schools not established by a school board will necessarily be under the purview of the state. Anyone who understands these five points will necessarily understand the chief purpose of this proposed amendment and will not be misled concerning its effect. And anyone who reads the text of the summary will readily be led to an understanding of each basic point.

- 27 -

The summary contains three basic elements regarding this proposed change in the Constitution.  These three elements in combination elegantly explain what the amendment does.  In the first element, the summary discloses the crucial fact regarding the existing constitutional provision: "Currently, district school boards have a constitutional duty to operate, control, and supervise all public schools."  This disclosure of the constitutional status quo provides the necessary basis for understanding the effect of the proposed amendment in curtailing the scope of school board duties.  The second and third elements are contained in a single sentence that sets up a contrast: "The amendment *maintains* a school board's duties to public schools it establishes, *but permits* the state to operate, control, and supervise public schools not established by the school board."  (Emphasis added.)  Thus, the second element of the summary points out that the proposed amendment "*maintains* a school board's duties to public *schools it establishes*."  (Emphasis added.)  Third, the summary—having identified the scope of the duties of school boards that are maintained—specifies what the proposal changes by stating that the amendment "permits the state to operate, control, and supervise public schools not established by the school board."

The five points that emerge from the text of the amendment are all made evident by these disclosures contained in the summary.  The summary brings home the distinction made in the text of the amendment between school-board-

established schools and non-school-board-established schools. In doing so, the summary makes clear both that the duty of school boards to "operate, control, and supervise" currently extends to all public schools and that the duty of school boards will be curtailed by the proposed amendment. Explaining the effect of the amendment, the summary identifies the category of school-board-established schools as falling within the scope of the school board's duty to "operate, control, and supervise." It similarly identifies the category of non-school-board-established schools as falling outside the scope of the school board duty to "operate, control, and supervise." And it recognizes the authority of the State regarding the operation, control, and supervision of public schools not established by a school board that necessarily follows from the elimination of the school board duty to "operate, control, and supervise" such schools.

The majority does not—because it cannot—effectively dispute any of this. Instead, it attempts to change the subject. Rather than focusing on whether the text of the summary accurately discloses the substance of the proposed amendment, the majority—staying on the path blazed by the trial court—assails the text of the proposed amendment itself. The majority jumps to the conclusion that the summary is misleading because certain questions about how the amendment would be implemented are left open by the text of the amendment and therefore not addressed in the summary. The majority's opinion thus repeatedly reveals that the

- 29 -

summary is condemned not because it is misleading, but because of what the majority views as deficiencies in the proposed constitutional amendment itself. This is a clear departure from the fundamental principle of our jurisprudence that in determining the adequacy of a ballot summary, we do not review the merits of the proposed constitutional amendment. *Fla. Dep't of State v. Slough*, 992 So. 2d 142, 147 (Fla. 2008).

The majority cites the trial court's conclusion that "both the *text* and the summary are entirely unclear as to which schools will be affected by the revision." Majority op. at 4 (emphasis added). The majority also repeats the trial court's criticism that the ballot summary fails to "inform the voter of the essential role school boards play in authorizing new schools." *Id.* The majority also refers to the trial court's conclusion that the summary is misleading because it "is conspicuously silent about who or what would undertake the[] responsibilities [to operate, control, and supervise] for schools not established by the school board." Majority op. at 5.

Although the majority acknowledges that "we look to objective criteria" in evaluating the sufficiency of a ballot summary, majority op. at 10, it nonetheless focuses on subjective matters by asserting that the deficiency of the summary "is best demonstrated by the proponents of the proposed revision, who each give different meaning to the language of the revision, its title, and its summary."

- 30 -

Majority op. at 9-10.  Such subjective matters concerning what various proponents have said about a proposal are beside the point.  The majority's line of analysis flies in the face of the principle established in our case law—to which the majority thoughtfully and meaninglessly tips its hat—that in determining whether a summary accurately describes a proposed amendment, "a court must look not to subjective criteria espoused by the amendment's sponsor but to *objective criteria inherent in the amendment itself.*"  *Armstrong v. Harris*, 773 So. 2d 7, 18 (Fla. 2000) (emphasis added).

Of course, the majority discusses the text of the amendment.  But it does so not to determine if the summary accurately reflects the substance of the amendment.  Instead, the majority—like the trial court—zeros in on perceived flaws in the amendment.  The majority complains that the summary fails to explain "which categories of public schools will be affected, and who or what will have the authority to establish future public schools if voters approve the revision."  Majority op. at 11.  The majority also faults the use of "the phrase 'established by' " as one that is not "consistently used in Florida Statutes."  *Id.*  The majority sums up: "It is entirely unclear from both the *text of the amendment* and the ballot language which of these public schools, or categories of public schools, would be affected.  Therefore, the problem 'lies not with what the summary says, but, rather,

- 31 -

with what it does not say.' " Majority op. at 12-13 (emphasis added) (quoting

*Askew v. Firestone*, 421 So. 2d 151, 156 (Fla. 1982)).

From all this it is clear that the majority is condemning the summary because the text of the amendment leaves open certain questions. The summary thus is rejected because of what the text of the amendment "does not say." Majority op. at 13 (quoting *Askew*, 421 So. 2d at 156). There is no requirement that a constitutional amendment resolve all questions concerning its implementation. And it is obvious that a proposed constitutional amendment is not bound by existing statutory terms. Here, as in the case of many constitutional provisions, space is established for the Legislature—which promulgates state policy through laws consistent with the Constitution—to make various policy choices related to implementation of the amendment. As the summary discloses, the amendment clearly affects schools not established by a school board. The policy choices related to such schools are properly left by the amendment to the Legislature. To conclude otherwise—as the majority does—is to attack the substance of the amendment itself.

The majority also concludes that the proposed amendment flies "under false colors," majority op. at 15, because the summary fails to inform the voters that currently "only district school boards may *authorize charter schools*." Majority op. at 14 (emphasis added). In support of this conclusion, the majority cites *Duval*

- 32 -

*County School Board v. State Board of Education*, 998 So. 2d 641, 642 (Fla. 1st DCA 2008), a decision that invalidated "section 1002.335, Florida Statutes, which established the 'Florida Schools of Excellence Commission' as an independent, state-level entity with the power to authorize charter schools throughout the State of Florida." To begin with, the term "authorize" (or any cognate term) is not found in the text of either the current constitutional provision or the proposed amendment. Reference to "charter schools" is likewise absent. And the *Duval County* decision does not establish an unfettered constitutional right of school boards to authorize charter schools.

The *Duval County* court recognized that the challenged statute "relegat[ed] local boards to essentially ministerial functions" concerning certain charter schools. *Id.* at 644. In invalidating the statute, the court stated: "This statute permits and encourages the creation of a parallel system of free public education escaping the *operation and control* of local elected school boards." *Id.* at 643 (emphasis added) (footnote omitted). The focus of the ruling was the removal from local school boards of "all the powers of *operation, control and supervision* of free public education specifically reserved in article IX, section 4(b) of the Florida Constitution . . . with regard to charter schools sponsored by the [Excellence] Commission." *Id.* (emphasis added). Nowhere does this decision establish the unfettered right of school boards to authorize or not authorize charter

schools that is suggested by the majority opinion.  Indeed, no such right currently exists under Florida law.  *See* § 1002.33(6)(c)3.a., Fla. Stat. (2018) (providing process for appeal of school board denial of charter school application, authorizing State Board of Education to "remand the application to the sponsor with its written decision that the sponsor [school board] approve or deny the application" and providing that the school board "sponsor shall implement the decision of the State Board of Education"); *see also Sch. Bd. of Palm Beach Cty. v. Fla. Charter Educ. Found., Inc.*, 213 So. 3d 356, 359 (Fla. 4th DCA 2017) (rejecting challenge to constitutionality of the charter school statute's appeal provision based on school board argument that the statute "empowers the State Board, and not the School Board, to determine the creation of a charter school").  The decision concerning the "authorization" of charter schools thus ultimately rests in the State Board of Education.  So the disclosure the majority says should be made concerning the current state of the law would itself be misleading.  The summary cannot be judged defective for failing to include a misleading statement.

In sum, the majority has failed to identify any defect in the summary.[7]  The people should not be prevented from making their own decision concerning the

---

7. I also reject the view expressed in the concurring opinions that Revision 8 is defective because it bundles three issues into one proposed amendment.  The Court recently rejected a similar argument regarding "bundling" in *County of Volusia v. Detzner*, 2018 WL 4272435, 43 Fla. L. Weekly S355 (Fla. Sept. 7, 2018).  Here, as in *County of Volusia*, "there is no basis for concluding" either

merits of the proposed amendment. I strongly dissent from the decision to remove this proposed amendment from the ballot.

POLSTON and LAWSON, JJ., concur.

Certified Judgments of Trial Courts in and for Leon County – John C. Cooper, Judge - Case No. 372018CA001523XXXXXX – An Appeal from the District Court of Appeal, First District, Case No. 1D18-3529

Pamela Jo Bondi, Attorney General, Daniel W. Bell, Deputy Solicitor General, Edward M. Wenger, Chief Deputy Solicitor General, and Blaine H. Winship, Special Counsel, Tallahassee, Florida,

    for Appellant

Ronald G. Meyer and Lynn C. Hearn of Meyer, Brooks, Demma and Blohm, P.A., Tallahassee, Florida; Scott D. McCoy of Southern Poverty Law Center, Tallahassee, Florida; Zoe M. Savitsky of Southern Poverty Law Center, New Orleans, Louisiana; and Sam Boyd of Southern Poverty Law Center, Miami, Florida,

    for Appellees

Edward J. Pozzuoli, Stephanie Alexander, and Jeffrey S. Wood of Tripp Scott, P.A., Fort Lauderdale, Florida,

    for Amici Curiae The Urban League of Miami and The Central Florida Urban League

---

"that the relationship between the issues addressed in separate measures identified in the ballot summary results in deception of the voters" or that "the structure of the ballot summary misleads the voters concerning what the proposal will do." *Id.* at S356. The Constitution contains an anti-bundling provision—known as a single subject requirement—in article XI, section 3, which governs certain amendments proposed through the initiative process. No similar requirement is contained in article XI, section 2, which governs proposals advanced by the Constitution Revision Commission. In the absence of such a requirement in the text of section 2, we should not impose one under a different label.

Benjamin J. Gibson and Amber Stoner of Shutts & Bowen, LLP, Tallahassee, Florida,

for Amici Curiae Florida Consortium of Public Charter Schools and Florida Charter School Alliance