# Supreme Court of Florida

_____

No. SC2023-1392

_____

## ADVISORY OPINION TO THE ATTORNEY GENERAL RE: LIMITING GOVERNMENT INTERFERENCE WITH ABORTION.

April 1, 2024

PER CURIAM.

The Attorney General of Florida has petitioned this Court for an advisory opinion concerning the validity of a proposed citizen initiative amendment to the Florida Constitution, circulated under article XI, section 3 of the Florida Constitution, and titled "Amendment to Limit Government Interference with Abortion." We have jurisdiction. *See* art. IV, § 10; art. V, § 3(b)(10), Fla. Const. We approve the proposed amendment for placement on the ballot.

## I. BACKGROUND

On October 9, 2023, the Attorney General petitioned this Court for an opinion regarding the validity of this initiative petition sponsored by Floridians Protecting Freedom, Inc. (the Sponsor). We invited interested parties to file briefs regarding the validity of the

initiative petition.  We received initial briefs from the Attorney General and four other opponents of the proposed amendment: Susan B. Anthony Pro Life America ("Susan B. Anthony"); the National Center for Life and Liberty ("Center for Life"); Florida Voters Against Extremism; and the Florida Conference of Catholic Bishops.  We received answer briefs arguing in favor of placing the proposed amendment on the ballot from the Sponsor and four other proponents: certain Former Florida Republican Elected Officials ("Former Republican Officials"); the American College of Obstetricians and Gynecologists; certain Florida Doctors; and certain Law Professors and Instructors.  Oral argument was heard on February 7, 2024.

The full text of the proposed amendment, which would create a new section in the Declaration of Rights in article I of the Florida Constitution, states:

> **SECTION __. Limiting government interference with abortion.**—Except as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider.

The ballot title for the proposed amendment is "Amendment to Limit Government Interference with Abortion," and the ballot summary states:

> No law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider. This amendment does not change the Legislature's constitutional authority to require notification to a parent or guardian before a minor has an abortion.

## II. ANALYSIS

### A. Standard of Review

In reviewing the validity of an initiative petition for placement on the ballot, "[t]his Court has traditionally applied a deferential standard of review." *Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions* (*Medical Marijuana I*), 132 So. 3d 786, 794 (Fla. 2014). Without regard to the merits or wisdom of the initiative, our review is limited to the following issues: (1) "the compliance of the text of the proposed amendment or revision with s. 3, Art. XI of the State Constitution"; (2) "the compliance of the proposed ballot title and substance with s. 101.161"; and (3) "whether the proposed amendment is facially invalid under the United States Constitution." § 16.061(1), Fla. Stat (2023). This

Court will invalidate a proposed amendment "only if it is shown to be 'clearly and conclusively defective.' "[1]  *Advisory Op. to Att'y Gen. re Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing, & Other Restrictions*, 320 So. 3d 657, 667 (Fla. 2021) (quoting *Advisory Op. to Att'y Gen. re Amend. to Bar Gov't from Treating People Differently Based on Race in Pub. Educ.* (*Treating People Differently*), 778 So. 2d 888, 891 (Fla. 2000)).  This Court's review of a proposal's compliance with article X, section 3 and section 101.161 is governed by the following principles:

> First, the Court will not address the merits or wisdom of the proposed amendment.  Second, "[t]he Court must act with extreme care, caution, and restraint before it removes a constitutional amendment from the vote of the people."  Specifically, where citizen initiatives are concerned, "[the] Court has no authority to inject itself in

---

1.  In her briefing, the Attorney General invites this Court to reconsider its long-held requirement that to invalidate a ballot initiative, this Court must conclude that the initiative is clearly and conclusively defective.  The Attorney General suggests that this Court need only consider whether the initiative violates the requirements of section 101.161(1), not whether it does so "clearly."  Essentially, the Attorney General seeks to reduce the opponents' burden here, *see Floridians Against Casino Takeover v. Let's Help Florida*, 363 So. 2d 337, 339 (Fla. 1978) (stating that the burden upon the opponent of an initiative proposal is to establish that the proposal is "clearly and conclusively defective" (quoting *Weber v. Smathers*, 338 So. 2d 819 (Fla. 1976); *Goldner v. Adams*, 167 So. 2d 575 (Fla. 1964))), which we decline to do.

the process, unless the laws governing the process have been 'clearly and conclusively' violated."

*Advisory Op. to Att'y Gen. re 1.35% Prop. Tax Cap, Unless Voter Approved*, 2 So. 3d 968, 971 (Fla. 2009) (alterations in original) (citations omitted).

With these principles in mind, we turn to the task at hand.

## B. Single-subject Requirement

Article XI, section 3 of the Florida Constitution provides in pertinent part:

> The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, *shall embrace but one subject and matter directly connected therewith.*

(Emphasis added.) "[I]n determining whether a proposal addresses a single subject the test is whether it 'may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme.'" *Fine v. Firestone*, 448 So. 2d 984, 990 (Fla. 1984) (quoting *City of Coral Gables v. Gray*, 19 So. 2d 318, 320 (Fla. 1944)). In other words, a proposal must manifest "a logical and natural oneness of purpose" to

accomplish the purpose of article XI, section 3.[2] *Advisory Op. to Att'y Gen. re Fla. Marriage Prot. Amend. (Marriage Protection)*, 926 So. 2d 1229, 1233 (Fla. 2006) (quoting *Fine*, 448 So. 2d at 990). The single-subject requirement is intended to "prevent[] a proposal 'from engaging in either of two practices: (a) logrolling; or (b) substantially altering or performing the functions of multiple branches of state   government.'" *Medical Marijuana I*, 132 So. 3d at 795 (quoting *Advisory Op. to Att'y Gen. re Water & Land Conservation—Dedicates Funds to Acquire & Restore Fla. Conservation & Recreation Lands* (*Water & Land Conservation*), 123

---

2.   Opponent Susan B. Anthony urges this Court to reconsider the "oneness of purpose" standard, asserting that it is too subjective and that the plain text of article XI, section 3, requiring "one subject," should instead be read more narrowly as requiring "one proposition."  While Susan B. Anthony suggests that a narrower interpretation of the single-subject requirement would be more faithful to the supremacy-of-text principle, its interpretation bears little relationship to the actual constitutional text.  There is a difference between a proposal addressing a particular "subject," and one that presents a single "proposition," and the constitutional text plainly states that an initiative "embrace but one *subject*."  Further, Susan B. Anthony ignores the text that immediately follows the word "subject" in article XI, section 3, which plainly permits a proposed amendment to address "matter directly connected" to the single subject.  Finally, our cases do not reflect a commitment to defining "subject" in such a narrow manner.  We thus decline Susan B. Anthony's invitation to adopt a narrower interpretation of the single-subject requirement.

So. 3d 47, 50-51 (Fla. 2013)).  It "is a rule of restraint designed to insulate Florida's organic law from precipitous and cataclysmic change."  *Advisory Op. to Att'y Gen.—Save Our Everglades* (*Save Our Everglades*), 636 So. 2d 1336, 1339 (Fla. 1994).  As explained below, the proposed amendment here does not violate the single-subject requirement.

This Court has defined logrolling as "a practice wherein several separate issues are rolled into a single initiative in order to aggregate votes or secure approval of an otherwise unpopular issue."  *Id.* at 1339.  "The purpose of the single-subject requirement is to allow the citizens to vote on singular changes in our government that are identified in the proposal and to avoid voters having to accept part of a proposal which they oppose in order to obtain a change which they support."  *Fine*, 448 So. 2d at 993.

Susan B. Anthony and Florida Voters Against Extremism assert that the proposed amendment engages in logrolling by reaching two separate categories of abortion—abortion before viability of the fetus and abortion based on a healthcare provider's authority—which present distinct moral and policy issues.  The "viability provision" would ban any law prohibiting, penalizing,

delaying, or restricting abortion before viability, regardless of the circumstances or the mother's reasons for seeking an abortion. This, according to these opponents, would be, in effect, a constitutional guarantee of abortion at any time and for any purpose before the fetus is viable. The "health provision" would bar any law that prohibits, penalizes, delays, or restricts abortion at any time—including after viability and until the moment of birth—so long as a "healthcare provider" says it is necessary to "protect" the mother's "health"—not "life." Opponents argue that these two provisions of the proposed amendment involve entirely different subjects. Susan B. Anthony points out that many voters would simultaneously oppose an amendment that prohibits government interference with all previability abortions but support an amendment prohibiting government interference with abortions sought to protect the health of the mother. Opponents argue that the proposed amendment forces those voters "to accept part of a proposal which they oppose," *id.*—a ban on laws prohibiting abortion before viability—"in order to obtain a change which they support," *id.*—a ban on laws prohibiting abortion when maternal health is in need of protection. The Sponsor and other proponents

contend that the proposed amendment addresses a single subject, namely, "limiting government interference with abortion."

Under both Florida and federal law, the *subject* of abortion has historically involved two major interconnected *matters*: the viability of the fetus and the health of the mother. *See generally Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022); *Roe v. Wade*, 410 U.S. 113, 163-64 (1973), *overruled by Dobbs*, 597 U.S. 215, *and holding modified by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); *In re T.W.*, 551 So. 2d 1186, 1190 (Fla. 1989), *receded from by Planned Parenthood of Sw. & Cent. Fla. v. State*, No. SC2022-1050 (Apr. 1, 2024) (slip op. at 2). "Abortion"—or, more specifically, "limits on government interference with abortion"—is the subject of the proposed amendment, and the viability of the fetus and the mother's health are "matter[s] directly connected" thereto. For this reason, the argument that the proposed amendment violates the single-subject requirement because voters may support some of the amendment's applications but not others also fails. Whether some voters may support only a portion of a proposed amendment and oppose another portion is not the inquiry that determines whether there is a violation of the

single-subject requirement. Instead, the prohibition on "logrolling refers to a practice whereby an amendment is proposed which contains *unrelated* provisions, some of which electors might wish to support, in order to get an otherwise disfavored provision passed." *Advisory Op. to Att'y Gen. re Rts. of Elec. Consumers Regarding Solar Energy Choice* (*Solar Energy Choice*), 188 So. 3d 822, 828-29 (Fla. 2016) (emphasis added) (citing *Advisory Op. to Att'y Gen. re Protect People, Especially Youth, from Addiction, Disease, & Other Health Hazards of Using Tobacco*, 926 So. 2d 1186, 1191 (Fla. 2006)); *see also Advisory Op. to Att'y Gen.—Ltd. Marine Net Fishing*, 620 So. 2d 997, 999 (Fla. 1993) ("The purpose of the single-subject restriction is to prevent the proposal of an amendment which contains two *unrelated* provisions, one which electors might wish to support and one which they might disfavor." (emphasis added)). Because viability and maternal health are interconnected matters related to the subject of abortion, the mere fact that electors might not agree with the entirety of the amendment does not render it violative of the single-subject requirement.

The Former Republican Officials point out that this Court has repeatedly approved ballot measures that addressed multiple

related facets of a subject. For example, in *Marriage Protection*, the proposed amendment both defined "marriage" as "the legal union of only one man and one woman" and prohibited "the substantial equivalent thereof," i.e., civil unions or domestic partnerships. 926 So. 2d at 1232. Although the opponents of the proposed amendment in that case contended that the definition of "marriage" and the prohibition on substantial equivalents were separate subjects, this Court concluded that they were both facets of "the singular subject of whether the concept of marriage and the rights and obligations traditionally embodied therein should be limited to the union of one man and one woman." *Id.* at 1234.

Similarly, within the context of the proposed amendment here, abortion "before viability" and "when necessary to protect the patient's health" are not separate subjects but facets of the singular subject of whether government "interference with abortion" should be "limit[ed]" when those circumstances are present. We have explained that "a proposed amendment may 'delineate a number of guidelines' consistent with the single-subject requirement as long as these components possess 'a natural relation and connection as component parts or aspects of a single dominant plan or scheme.' "

*Medical Marijuana I,* 132 So. 3d at 796 (quoting *Advisory Op. to Att'y Gen. re Standards for Establishing Legis. Dist. Boundaries*, 2 So. 3d 175, 181-82 (Fla. 2009)). Banning laws that restrict previability abortion and abortion performed to protect maternal health are aspects of a single scheme: limiting government interference with abortion.

Susan B. Anthony's reliance on *In re Advisory Opinion to the Attorney General—Restricts Laws Related to Discrimination* (*Discrimination Laws*), 632 So. 2d 1018 (Fla. 1994), in support of its position is misplaced. The proposed amendment in that case stated, in pertinent part,

> The state, political subdivisions of the state, municipalities or any other governmental entity shall not enact or adopt any law regarding discrimination against persons which creates, establishes or recognizes any right, privilege or protection for any person based upon any characteristic, trait, status, or condition other than race, color, religion, sex, national origin, age, handicap, ethnic background, marital status, or familial status.

*Id.* at 1020. This Court concluded that the proposed initiative violated the single-subject rule because "it enumerate[d] ten classifications of people that would be entitled to protection from discrimination if the amendment were passed." *Id.* ("[A] voter may

- 12 -

want to support protection from discrimination for people based on race and religion, but oppose protection based on marital status and familial status.").  Here, unlike what we characterized as the "expansive generality" and "disparate" classifications present in *Discrimination Laws*, the proposed amendment concerns only a single item—abortion.

Susan B. Anthony also relies on *Advisory Opinion to the Attorney General re Fairness Initiative Requiring Legislative Determination that Sales Tax Exemptions and Exclusions Serve a Public Purpose* (*Fairness Initiative*), 880 So. 2d 630 (Fla. 2004).  In that case, we concluded that the proposed amendment

> contain[ed] three disparate subjects: (1) a scheme for the Legislature to review existing exemptions to the sales tax under chapter 212; (2) the creation of a sales tax on services that currently does not exist; and (3) limitations on the Legislature's ability to create or continue exemptions and exclusions from the sales tax.

*Id.* at 634.  This Court reasoned that

> [w]hile all of these three goals arguably relate to sales taxes, and any one of these three goals might be the permissible subject of a constitutional amendment under the initiative process, we conclude that together they constitute impermissible logrolling and violate the single-subject requirement of article XI, section 3, of the Florida Constitution because of the substantial, yet disparate, impact they may have.

- 13 -

*Id.* at 635. The elements of the proposed amendment in *Fairness Initiative* lacked the "natural relation and connection" present in the proposed amendment in this case. The singular goal of the proposed amendment here is to limit government interference with the termination of pregnancy. It involves one subject and addresses the related ability of State and local governments to "interfere[] with" that subject.

The proposed amendment also will not substantially alter or perform the functions of multiple branches of government. "This Court has held that while most amendments will 'affect' multiple branches of government this fact alone is insufficient to invalidate an amendment on single-subject grounds . . . ." *Advisory Op. to Att'y Gen. re Right to Treatment & Rehab.*, 818 So. 2d 491, 496 (Fla. 2002). Indeed "it [is] difficult to conceive of a constitutional amendment that would not affect other aspects of government to some extent." *Solar Energy Choice*, 188 So. 3d at 830 (alteration in original) (quoting *Advisory Op. to Att'y Gen. re Ltd. Casinos*, 644 So. 2d 71, 74 (Fla. 1994)). But it is only "when a proposal *substantially* alters or performs the functions of multiple branches that it violates the single-subject test.'" *Medical Marijuana I*, 132 So. 3d at 795

(emphasis added) (quoting *Advisory Op. to Att'y Gen. re Fish & Wildlife Conservation Comm'n*, 705 So. 2d 1351, 1353-54 (Fla. 1998)); *see also Advisory Op. to Att'y Gen. re Prohibiting State Spending for Experimentation that Involves the Destruction of a Live Hum. Embryo* (*Prohibiting State Spending*), 959 So. 2d 210, 213 (Fla. 2007) ("While we recognize that the proposed amendment, if enacted, appears to limit the authority of the legislative and executive branches of state government, we conclude that this proposed amendment does not *substantially* alter or perform the functions of multiple branches of government.").

Here, the proposed amendment will affect the government "only in the general sense that any constitutional provision does" by requiring compliance with a new constitutional rule. *Solar Energy Choice*, 188 So. 3d at 830. It will not require any of the branches of government to perform any specific functions nor would it substantially alter their functions. Instead, it primarily restricts the authority of the legislative branch to pass legislation that would "interfere" with abortion under certain circumstances. This is not the type of "precipitous" or "cataclysmic" change to the government structure indicative of substantially altering or performing the

- 15 -

functions of multiple branches of government that the single-subject rule is intended to prevent.  *See, e.g., In re Advisory Op. to Att'y Gen. re Limits or Prevents Barriers to Local Solar Elec. Supply*, 177 So. 3d 235, 244-45 (Fla. 2015) (concluding that although the proposed amendment would limit the authority of the Legislature and other governmental entities to regulate in certain areas, it did "not substantially alter or perform the functions of multiple branches of government producing 'precipitous' or 'cataclysmic' changes").

We conclude that the proposed amendment before us embraces but one subject—limiting government interference with abortion—and matter directly connected therewith.  It does not violate the single-subject provision of article XI, section 3.

### C.  Ballot Title and Summary

Section 101.161(1), Florida Statutes (2023), sets forth certain technical and clarity requirements for ballot titles and summaries. As to the technical requirements, the statute requires that the ballot title "consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of" and that "[t]he ballot summary of the amendment or other public

measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure." § 101.161(1), Fla. Stat. Here, the ballot title is composed of seven words and the ballot summary is composed of thirty-four words, clearly meeting the word count limitations provided in section 101.161(1).

Section 101.161(1) also requires that a ballot summary "be printed in clear and unambiguous language." "This is to provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot." *Advisory Op. to Att'y Gen.—Fee on Everglades Sugar Prod.*, 681 So. 2d 1124, 1127 (Fla. 1996). "Accordingly, in reviewing the ballot title and summary, this Court asks two questions: (1) whether the ballot title and summary fairly inform the voter of the chief purpose of the amendment; and (2) whether the language of the ballot title and summary misleads the public." *Solar Energy Choice*, 188 So. 3d at 831. "[I]t is not necessary to explain every ramification of a proposed amendment, only the chief purpose." *Water & Land Conservation*, 123 So. 3d at 50-51 (alteration in original) (quoting *Advisory Op. to Att'y Gen. re*

*Additional Homestead Tax Exemption* (*Homestead Tax Exemption*), 880 So. 2d 646, 651 (Fla. 2004)).

Opponents contend that the ballot title and summary fail to fairly inform voters of the chief purpose of the amendment because, they argue, the chief purpose is not to limit government interference with abortion, as the title states, but to effectively provide for abortion on demand, up until the moment of birth, by requiring broad exceptions for maternal health. The opponents find it all but impossible to imagine a circumstance in which a woman who wants a postviability (including late-term or partial-birth) abortion will not be able to find a "healthcare provider" willing to say that an abortion is somehow necessary to protect her health—physical, mental, or otherwise. The opponents further argue that the ballot title and summary do not fully inform voters that the sweep of the proposed amendment is broad in its collateral effects on current Florida statutes regulating abortion; that the amendment may authorize late-term abortions for the sake of maternal health; or that "health" could encompass mental as well as physical health.

While it may well be true that the proposed amendment would have broad effects flowing from its adoption that are not fully

explained in the ballot summary, to fairly inform voters of its chief purpose, a ballot summary—as we have already said—"need not explain every detail or ramification of the proposed amendment." *Treating People Differently*, 778 So. 2d at 899 (quoting *Advisory Op. to Att'y Gen. re Prohibiting Pub. Funding of Pol. Candidates*, 693 So. 2d 972, 975 (Fla. 1997)). Nor must it provide "an exhaustive explanation of the interpretation and future possible effects of the amendment." *Id.*

The ballot summary here tracks the language of the proposed amendment itself and provides that "no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider." That the proposed amendment's principal goal and chief purpose is to limit government interference with abortion is plainly stated in terms that clearly and unambiguously reflect the text of the proposed amendment. And the broad sweep of this proposed amendment is obvious in the language of the summary. Denying this requires a flight from reality. We acknowledge that the text of the amendment—like any legal text—presents interpretive questions, but we neither endorse nor reject

any litigant's assertions about how the proposed amendment might be interpreted in the future and our decision today takes no position on the scope of legislative discretion that would remain if the proposed amendment were to become law.

The second question we must consider in reviewing the ballot title and summary is whether the language of the ballot title and summary will be misleading to voters. *Medical Marijuana I*, 132 So. 3d at 797. The ballot title—"Amendment to Limit Government Interference with Abortion"—clearly identifies the subject of the proposed amendment. Nonetheless, some opponents still contend that the ballot title is misleading because, they suggest, the proposed amendment does more than "limit" government interference with abortion and the phrase "government interference with abortion" is improper inflammatory political rhetoric. We disagree. The word "limit" is not misleading in the title or summary. The proposed amendment does not eliminate the government's ability to "interfere" with abortion in all circumstances; by its plain language, it limits government interference before viability or when necessary to protect the mother's health. Its reference to article X, section 22 of the Florida

Constitution—which grants the Legislature authority to require notification to a parent or guardian of a minor before termination of the minor's pregnancy—explicitly provides for an instance in which the legislative authority to "interfere[] with" abortion will be preserved in the event the proposed amendment is passed. And the proposed amendment would not prohibit the Legislature from passing laws "interfering" with abortion after the point of viability and when the mother's health is not in jeopardy. The ballot title's inclusion of the word "limit" is therefore not misleading but accurately explains that the Legislature will retain authority to "interfere[] with" abortions under certain circumstances.

Nor does the ballot title contain inflammatory political rhetoric. The "government interference" language in the ballot title is also found in both state and federal abortion precedent. *See, e.g.,* *N. Fla. Women's Health & Counseling Servs., Inc. v. State*, 866 So. 2d 612, 615 (Fla. 2003) ("Under our decision, parent and minor are free to do as they wish in this regard, without government interference."), *receded from by Planned Parenthood of Sw. & Cent. Fla.*, No. SC2022-1050 (Apr. 1, 2024) (slip op. at 2-3, 50); *Dobbs*, 597 U.S. at 273 (reasoning that *Roe* conflated "the right to shield

information from disclosure and the right to make and implement important personal decisions without governmental interference"). The "government interference" terminology is a fair description of the proposal. Thus, we cannot say that the phrase "government interference" is inflammatory political rhetoric.

The opponents contend that the ballot summary is misleading because it fails to define "viability," "health," or "healthcare provider"; does not disclose that it might be left to a "healthcare provider" to determine when a fetus is viable; and does not disclose that despite its proclamation that no law will prohibit previability abortion, previability partial-birth abortions will remain prohibited under the federal partial-birth abortion ban, *see* 18 U.S.C. § 1531. But none of these things render the summary misleading or inadequate in any way.

This Court has held that it will not strike a proposal from the ballot based upon an argument concerning "the ambiguous legal effect of the amendment's text rather than the clarity of the ballot title and summary." *Advisory Op. to Att'y Gen. re Voter Control of Gambling* (*Voter Control of Gambling*), 215 So. 3d 1209, 1216 (Fla. 2017). The question for our consideration here is not whether the

- 22 -

proposed constitutional language itself is free of any ambiguity or whether there are uncertainties regarding the potential legal effect if the proposed amendment were to pass but whether the ballot summary misleads voters as to the new constitutional language voters are asked to adopt in the proposed amendment itself. In other words, it asks whether the ballot summary will give voters a false impression about what is contained in the actual text of the proposed amendment.

The ballot summary essentially follows the language of the proposed amendment. It says nothing more and nothing less than what the operative language of the proposed amendment itself says. In light of this almost verbatim recitation of the text of the proposed amendment, it cannot be said that the ballot summary will mislead voters regarding the actual text of the proposed amendment. *See Advisory Op. to Att'y Gen. re Voting Restoration Amend.*, 215 So. 3d 1202, 1208 (Fla. 2017) ("[T]he ballot title and summary also do not mislead voters with regard to the actual content of the proposed amendment. Rather, together they recite the language of the amendment almost in full."); *Prohibiting State Spending*, 959 So. 2d at 214 (upholding a summary that contained language identical to

that in the proposed amendment); *Marriage Protection*, 926 So. 2d 1229 (upholding a summary that reiterated almost all of the language contained in the amendment); *Advisory Op. to Att'y Gen. re Med. Liab. Claimant's Comp. Amend.*, 880 So. 2d 675 (Fla. 2004) (same).

The fundamental problem with the main clarity arguments advanced by the opponents is that they effectively would impose requirements on the substance of a proposed amendment rather than require accuracy in the ballot summary. But an alleged ambiguity of a proposed amendment itself does not render a ballot summary misleading. And this Court "does not have the authority or responsibility to rule on the merits or the wisdom of these proposed initiative amendments." *Treating People Differently*, 778 So. 2d at 891 (quoting *Advisory Op. to Att'y Gen. re Tax Limitation*, 644 So. 2d 486, 489 (Fla. 1994)). There is simply no basis in the constitution for imposing a requirement for clarity on the substance of a proposed amendment. And section 101.161(1)'s requirement for a ballot summary to be in "clear and unambiguous language" cannot be reasonably understood as imposing an extra-constitutional requirement concerning the substance of proposed

amendments.  Nor should a summary be expected to resolve every interpretive question presented by a proposed amendment.  Any summary that attempts to do so will no doubt be challenged for making the wrong interpretive choices.  Indeed, the sponsor of an initiative does not have the authority—under the guise of clarification—to use the ballot summary to narrow or broaden the meaning of the words used in the amendment text itself.  In our legal system, the meaning of terms placed in the constitution is determined by the application of established interpretive conventions and separation of powers principles; legal meaning is not dictated by an amendment's sponsor.

The opponents argue that the proposed amendment is misleading for failing to mention that it would not affect the federal ban on partial-birth abortion.  "This Court has . . . never required that a ballot summary inform voters as to the current state of federal law and the impact of a proposed state constitutional amendment on federal statutory law as it exists at this moment in time."  *Medical Marijuana I*, 132 So. 3d at 808.  This case is thus distinguishable from *Advisory Opinion to the Attorney General re Adult Use of Marijuana*, 315 So. 3d 1176 (Fla. 2021), in which this

Court concluded that a ballot summary was affirmatively misleading "regarding the interplay between the proposed amendment and federal law." *Id.* at 1180 (quoting *Medical Marijuana I*, 132 So. 3d at 808). There, we expressly rejected the idea that the ballot summary was defective for failing to "include language that [wa]s not in the proposed amendment itself," and instead concluded that the ballot summary was defective for its omission of "important language that [*wa*]s found 'in the proposed amendment itself.'" *Id.* at 1183 (quoting *Medical Marijuana I*, 132 So. 3d at 808).

In the end, the ballot title and summary fairly inform voters, in clear and unambiguous language, of the chief purpose of the amendment and they are not misleading. The ballot summary's nearly verbatim recitation of the proposed amendment language is an "accurate, objective, and neutral summary of the proposed amendment." *See Homestead Tax Exemption*, 880 So. 2d at 653-54 ("[A]n accurate, objective, and neutral summary of the proposed amendment is the *sine qua non* of the citizen-driven process of amending our constitution."). Accordingly, there is no basis to

reject the proposed summary and ballot title under section 101.161, Florida Statutes.

In reaching this conclusion, we recognize that "the polestar of our analysis is the candor and accuracy with which the ballot language informs the voters of a proposed amendment's effects." *Dep't of State v. Fla. Greyhound Ass'n, Inc.*, 253 So. 3d 513, 520 (Fla. 2018). Here, there is no lack of candor or accuracy: the ballot language plainly informs voters that the material legal effects of the proposed amendment will be that the government will be unable to enact laws that "prohibit, penalize, delay, or restrict" previability abortions or abortions necessary to protect the mother's health. It is undeniable that those are the main and material legal effects of the proposed amendment.

"[W]e have also recognized 'that voters may be presumed to have the ability to reason and draw logical conclusions' from the information they are given." *Id.* at 520 (quoting *Smith v. Am. Airlines, Inc.*, 606 So. 2d 618, 621 (Fla. 1992)). Because of this, ballot language—as we have previously mentioned—"is not required to explain every detail or ramification of the proposed amendment." *Id.* (quoting *Smith*, 606 So. 2d at 620). We thus presume that

voters will have an understanding of the obviously broad sweep of this proposed amendment despite the fact that the ballot summary does not and cannot reveal its every possible ramification or collateral effect. *Cf. Advisory Op. to Att'y Gen. re Ltd. Casinos*, 644 So. 2d at 75 (noting that "[t]he seventy-five word limit placed on the ballot summary as required by statute does not lend itself to an explanation of all of a proposed amendment's details").

Even if elements of ambiguity in the text of a proposed amendment could result in the invalidity of a proposal—a proposition we reject—no such ambiguity has been shown here. Rather, the challenged concepts have been at the forefront of the abortion debate in this country for more than fifty years—a debate that may be at its height today in the wake of *Dobbs*. And while some indeterminacy remains regarding these concepts, it is difficult to imagine a Florida voter in 2024 who would be befuddled in any material way by the ballot summary or proposed amendment due to the use of the terms "viability," "health," and "healthcare provider."

Regarding whether ambiguity in the text of a proposed amendment can be the basis for a finding that the proposal is invalid, we acknowledge tension in our case law. But we have never

given a reasoned explanation of any basis for applying the requirements designed to prevent misleading ballot summaries as a substantive limitation on the content of a proposed amendment. And our most recent pronouncement on the subject is in *Department of State v. Hollander*, 256 So. 3d 1300, 1311 (Fla. 2018), in which we unequivocally stated: "[T]his Court has held that it will not strike a proposal from the ballot based upon an argument concerning 'the ambiguous legal effect of the amendment's text rather than the clarity of the ballot title and summary.'" (quoting *Voter Control of Gambling*, 215 So. 3d at 1216). We see no reason to depart from our most recent ruling on this question.

The opponents emphasize our decision in *Askew v. Firestone*, 421 So. 2d 151 (Fla. 1982). But *Askew* is entirely inapposite. In *Askew*, we determined that the chief purpose of the proposed amendment was "to remove the two-year ban on lobbying by former legislators and elected officers." *Id.* at 156. We found the ballot summary to be fatally defective because although it "indicate[d] that the amendment [wa]s a restriction on one's lobbying activities, the amendment actually g[ave] incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence

lobbying before their former agencies which [wa]s . . . precluded."
*Id.* at 155-56. In other words, the ballot summary was fatally
misleading because it operated to permit something when it said
that it was "[p]rohibit[ing]" something. *Id.* at 153. No similar
infirmity exists in this case. As previously stated, "[t]hat the
proposed amendment's principal goal and chief purpose is to limit
government interference with abortion is plainly stated in terms
that clearly and unambiguously reflect the text of the proposed
amendment." *Supra* at 19.

The decision in *Wadhams v. Board of County Commissioners of
Sarasota County*, 567 So. 2d 414 (Fla. 1990), is likewise
distinguishable from the circumstances here. In *Wadhams*, the full
text of a charter provision—with amendments engrossed—was
placed on the ballot so that the voters were not informed of what
was being changed in the text of the charter. *Id.* at 415. We held
"that the *chief purpose* of the amendment was to curtail the Charter
Review Board's right to meet," but nothing on the ballot gave the
voter information necessary to understand that fact. *Id.* at 416.
Nothing like that is occurring in this case.

We are told by dissenting colleagues that "the vagueness of the proposed amendment itself leaves many key issues undetermined." Dissenting op. at 46 (Grosshans, J.). Indeed, we are advised that the "language and structure" of the proposed amendment are "overwhelmingly vague and ambiguous" and that the proposal in fact has "no readily discernible meaning." Dissenting op. at 66 (Sasso, J.). We are further instructed that the summary—in tracking the text of the proposed amendment—"does not attempt to explain that the amendment itself is similarly vague and ambiguous." *Id.* at 76. Furthermore, the supposed ambiguity is not "self-evident from the vague and ambiguous nature of the summary." *Id.* We are also told that the language of the summary and proposed amendment "hides the ball" and "*explains nothing*" but then are instructed on a series of far-reaching "effects" gleaned from that very language. Dissenting op. at 53 (Francis, J.). Again, as we have explained, the suggestion that an amendment sponsor must use a ballot summary to "clarify" the text of an assertedly vague proposal ignores limits on the sponsor's own authority. And we see no basis in law or common sense to require a ballot summary to announce, as if in a warning label, "caution: this

amendment contains terms with contestable meanings or applications." Voters can see and decide for themselves how the specificity of the proposal's terms relates to the proposal's merits. For reasons that are evident from what we have already said, none of this is convincing.[3]

Lawyers are adept at finding ambiguity. Show me the text and I'll show you the ambiguity. The predominant reasoning in the dissents would set this Court up as the master of the constitution with unfettered discretion to find a proposed amendment ambiguous and then to deprive the people of the right to be the judges of the merits of the proposal. It would open up a playground for motivated reasoning and judicial willfulness. This Court has an

3. It is also suggested that the voters should be informed that the proposed amendment "could, and likely would, impact how personhood is defined for purposes of article I, section 2 of our constitution." Dissenting op. at 49 (Grosshans, J.). The constitutional status of a preborn child under existing article I, section 2 presents complex and unsettled questions. Until our decision today to recede from *T.W.*, this Court's jurisprudence for the past thirty-odd years had *assumed* that preborn human beings are *not* constitutional persons. *See T.W.*, 551 So. 2d at 1193-94 (treating the fetus as only "potential life"), *receded from on other grounds by Planned Parenthood of Sw. & Cent. Fla.*, No. SC2022-1050 (Apr. 1, 2024). Given the unsettled nature of this issue, any "disclosure" would be speculative and therefore unwarranted.

important role in determining the validity of proposed amendments and ensuring that ballot summaries do not mislead the voters. But nothing in the law of this state gives the Court a stranglehold on the amendment process. We decline to adopt a standard that would effectively vest us with the power to bar an amendment from the ballot because of a supposed ambiguity in the text of the amendment. We decline to encroach on the prerogative to amend their constitution that the people have reserved to themselves.

### D.  Facial Invalidity

In 2020, section 16.061(1), Florida Statutes, was amended to direct the Attorney General that in addition to requesting an advisory opinion regarding the compliance of a proposed amendment and ballot language with article XI, section 3 and section 101.161, she also requests an opinion as to "whether the proposed amendment is facially invalid under the United States Constitution." *See* ch. 2020-15, § 2, Laws of Fla. Despite this directive, the Attorney General failed to request that we issue an opinion concerning the facial invalidity of the proposed amendment in this proceeding, and only one opponent contends that the proposed amendment is facially invalid. Opponent Center for Life

- 33 -

argues that the proposed amendment is facially invalid under the Supremacy Clause of the United States Constitution,[4] because it is preempted by federal law, namely 18 U.S.C. § 1531, which prohibits partial-birth abortion.[5]  Specifically, the Center for Life argues that the "viability provision" of the proposed amendment—which purportedly would ban any law that "prohibit[s], penalize[s], delay[s], or restrict[s] abortion before viability"—sets up an inherent, irreconcilable conflict with federal law because the proposed amendment's efforts to prohibit any restriction on

---

4.  *See* art. VI, cl. 2, U.S. Const. ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

5.  Under federal law, partial-birth abortion is defined as

> deliberately and intentionally vaginally deliver[ing] a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus[,]

18 U.S.C. § 1531(b)(1)(A), and is prohibited unless "necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury," 18 U.S.C. § 1531(a).

previability abortion cannot coexist with the federal ban on partial-birth abortion. Neither the Sponsor nor any of the proponents addressed the Center for Life's argument.

Assuming congressional preemption is even an appropriate consideration for this Court in assessing facial validity,[6] there is no basis for accepting the Center for Life's argument here. For a provision of state law, including a state constitutional amendment, "to be held facially unconstitutional, the challenger must demonstrate that no set of circumstances exists in which the [provision] can be constitutionally applied." *Abdool v. Bondi*, 141 So. 3d 529, 538 (Fla. 2014). The federal prohibition on partial-birth abortion would by no means invalidate the proposed amendment in all its applications.

---

6. As a threshold issue, no one has briefed whether section 16.061 uses the phrase "invalid under the United States Constitution" to include any proposed amendment that would be preempted by an act of Congress or if that phrase should instead be interpreted to apply only if a proposed amendment is in conflict with a substantive provision of the United States Constitution. *See Advisory Op. to Att'y Gen. re: Adult Personal Use of Marijuana*, SC2023-0682, at 16 note 7 (Apr. 1, 2024).

- 35 -

# III. CONCLUSION

We conclude that the proposed amendment complies with the single-subject requirement of article XI, section 3 of the Florida Constitution, and that the ballot title and summary comply with section 101.161(1), Florida Statutes. And there is no basis for concluding that the proposed amendment is facially invalid under the United States Constitution. Accordingly, we approve the proposed amendment for placement on the ballot.

No rehearing will be permitted.

It is so ordered.

CANADY, LABARGA, and COURIEL, JJ., concur.
MUÑIZ, C.J., concurs with an opinion, in which CANADY and COURIEL, JJ., concur.
GROSSHANS, J., dissents with an opinion, in which SASSO, J., concurs.
FRANCIS, J., dissents with an opinion.
SASSO, J., dissents with an opinion, in which GROSSHANS and FRANCIS, JJ., concur.

MUÑIZ, C.J., concurring.

Animating the majority's decision today is the constitutional principle that "[a]ll political power is inherent in the people." Art. I, § 1, Fla. Const. A judge's obedience to that principle does not signal personal indifference to the objective justice of a proposed

- 36 -

constitutional amendment. It also does not imply that our legal tradition views considerations of justice as irrelevant to legal interpretation. *See, e.g., Bancroft Inv. Corp. v. City of Jacksonville*, 27 So. 2d 162, 171 (Fla. 1946) ("If the positive law (constitution or statute) does not give a direct answer to the question, the court is at liberty on the factual basis to indulge the rule of reason to reach a result consonant with law and justice."). Instead, our Court's constrained role in the amendment process is dictated by the limited authority and task the people have assigned us.

By contrast, questions of justice are appropriately at the heart of the voters' assessment of a proposed amendment like the one under review. With its reference to the existence of "inalienable rights" in all persons, our constitution's Declaration of Rights assumes a pre-constitutional, objective moral reality that demands our respect—indeed, a moral order that government exists to protect. The proposed amendment would constitutionalize restrictions on the people's authority to use law to protect an entire class of human beings from private harm. It would cast into doubt the people's authority even to enact protections that are prudent, compassionate, and mindful of the complexities involved. Under

- 37 -

our system of government, it is up to the voters—not this Court—to decide whether such a rule is consistent with the deepest commitments of our political community.

With these considerations in mind, we fully concur in the Court's opinion.

CANADY and COURIEL, JJ., concur.

GROSSHANS, J., dissenting.

In the decades after *Roe v. Wade* was decided, abortion was rarely an issue on which the public made decisions—either directly or through their elected representatives. *See Roe*, 410 U.S. 113 (1973). Instead, the courts acted as policymakers, and judges determined the boundaries and scope of abortion regulations. However, courts were unable to settle the complicated issues surrounding abortion, and even the U.S. Supreme Court struggled to justify the constitutional basis for such a right. *See id.* at 153 (holding that abortion is a constitutional right as part of the "right of privacy"); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992) (joint opinion) ("Constitutional protection of the woman's decision to terminate her pregnancy derives from the *Due Process Clause* of the Fourteenth Amendment." (emphasis added)); *cf. Dobbs*

*v. Jackson Women's Health Org.*, 597 U.S. 215, 279 (2022) ("The Court [in *Casey*] abandoned any reliance on a privacy right and instead grounded the abortion right entirely on the Fourteenth Amendment's Due Process Clause.").

Stressing these points and others, the Supreme Court relinquished the power that *Roe* claimed—returning the issue of abortion "to the people and their elected representatives." *See Dobbs*, 597 U.S. at 259. Now, in the post-*Dobbs* era, citizens must wrestle with how to balance the compelling interests of bodily autonomy and unborn life, while considering scientific advances, policy choices, and serious ethical implications. *Cf. Casey*, 505 U.S. at 979 (Scalia, J., concurring in the judgment in part and dissenting in part) ("The permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting."). These are difficult issues, and both sides of the debate have acted, at times rashly, in an attempt to resolve an issue on which there is little consensus. And we are reminded, yet again, what has been acknowledged by the Supreme Court many times—

abortion is fundamentally different. *See Dobbs*, 597 U.S. at 257; *Roe*, 410 U.S. at 159; *Casey*, 505 U.S. at 852 (joint opinion).

Today, we consider an initiative that proposes to amend our constitution by providing express protection for abortion procedures. The proposed amendment, with one exception, broadly forbids any "law" "prohibit[ing], penaliz[ing], delay[ing], or restrict[ing] abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider."

We have described our role in these advisory opinions as narrow. We determine if the proposed amendment meets our constitution's single-subject requirement and assess whether the ballot summary offers an *explanatory statement of the amendment's chief purpose. See In re Advisory Op. to Att'y. Gen. re Use of Marijuana for Debilitating Med. Conditions*, 181 So. 3d 471, 478 (Fla. 2015); *cf.* art. XI, § 3, Fla. Const. (single-subject rule); § 101.161, Fla. Stat. (2023) (requiring summary to set forth "explanatory statement . . . of the chief purpose of the measure").

Nevertheless, as revealed by our precedent, the precise scope of our review in this advisory role is subject to debate. The majority

- 40 -

implies that we check to see if the summary and title track the amendment's text. *See* majority op. at 23-24 (collecting cases which involved summaries that tracked the proposed amendments). However, in a long line of decisions, we have consistently interpreted our role to be more comprehensive and have examined the material legal effects of the amendment—thereby ensuring that the voters are not misled and have fair notice of the decision before them on the ballot. *See, e.g., Wadhams v. Bd. of Cnty. Comm'rs of Sarasota Cnty.*, 567 So. 2d 414, 416 (Fla. 1990); *Dep't of State v. Fla. Greyhound Ass'n, Inc.*, 253 So. 3d 513, 520 (Fla. 2018) ("Ballot language may be clearly and conclusively defective either in an affirmative sense, because it misleads the voters as to the material effects of the amendment, *or in a negative sense by failing to inform the voters of those material effects.*" (emphasis added)); *Advisory Op. to Att'y Gen. re Prohibits Possession of Defined Assault Weapons* (*Assault Weapons*), 296 So. 3d 376, 381 (Fla. 2020) (same). As Justice Sasso notes in her dissent, no party in this case has argued that our precedent applying this approach in ballot-summary review is erroneous. And under this approach, we have found both citizens' initiative proposals and legislatively proposed ballot

- 41 -

initiatives to be defective. Yet, to my knowledge, the Legislature has not acted to restrict or narrow this Court's role in reviewing a ballot summary, nor has it attempted to clarify that our interpretation is improper.

Accordingly, our precedent supports the conclusion that our statutory duty requires more than simply inspecting the summary for technical compliance. Instead, we determine if the summary clearly explains the chief purpose of the amendment. This will, at times, require the summary do more than simply echo the amendment's text.

We have stated many times that the summary and title must be accurate and informative so that the "electorate is advised of the true meaning, *and ramifications*, of an amendment." *See, e.g., Advisory Op. to Att'y Gen. re Tax Limitation*, 644 So. 2d 486, 490 (Fla. 1994) (emphasis added); *Advisory Op. to Att'y Gen. re Med. Liab. Claimant's Comp. Amend.*, 880 So. 2d 675, 679 (Fla. 2004) ("These requirements make certain that the 'electorate is advised of the true meaning, and ramifications, of an amendment.' " (quoting *Tax Limitation*, 644 So. 2d at 490)); *Detzner v. League of Women Voters of Fla.*, 256 So. 3d 803, 807 (Fla. 2018) (same). And I

acknowledge that the summary "need not explain every detail or ramification of the proposed amendment" so long as they "give the voter fair notice of the decision he or she must make." *Detzner*, 256 So. 3d at 807 (citations omitted).

However, I disagree with the majority's suggestion that if the summary is an "almost verbatim recitation of the text of the proposed amendment" it cannot be misleading. Majority op. at 23. The majority finds that a parroting summary cannot be affirmatively "mislead[ing] . . . regarding the actual text of the proposed amendment." *Id.* That, however, fails to address if the summary is negatively misleading for omitting material legal effects. And in declining to consider this point, the majority distinguishes our opinion in *Advisory Opinion to the Attorney General re Adult Use of Marijuana*, 315 So. 3d 1176 (Fla. 2021) (rejecting a summary for omitting material language found in the amendment), seemingly characterizing that case as the axiomatic example of misleading by omission.

The majority also does not account for the numerous other cases that have rejected summaries for misleading by omission, and others that have approved summaries while reaffirming that

doctrine.  We have repeatedly reaffirmed the broader holding that summaries must tell voters the amendment's legal effects.  *See, e.g., Evans v. Firestone*, 457 So. 2d 1351, 1355 (Fla. 1984) (the summary "should tell the voter the legal effect of the amendment, and no more"); *Advisory Op. to Att'y Gen. re Fla. Marriage Prot. Amend.*, 926 So. 2d 1229, 1238 (Fla. 2006) (same); *Assault Weapons*, 296 So. 3d at 381 (ballot can be clearly and conclusively defective "in a negative sense by failing to inform the voters [of] material effects of the amendment" (quoting *Advisory Op. to Att'y Gen. re Right to Competitive Energy Mkt. for Customers of Inv'r-Owned Utils.*, 287 So. 3d 1256, 1260 (Fla. 2020)); *Greyhound*, 253 So. 3d at 520 (same).

Although we have indicated that parroting the language of an amendment in the summary may easily satisfy the misleading prong,[7] we have never claimed that doing so would always be

---

7.  *See Advisory Op. to Att'y Gen. re Voting Restoration Amend.*, 215 So. 3d 1202, 1208 (Fla. 2017) ("[T]he ballot title and summary also do not mislead voters with regard to the actual content of the proposed amendment.  Rather, together they recite the language of the amendment almost in full."); *Advisory Op. to Att'y Gen. re Prohibiting State Spending for Experimentation that Involves the Destruction of a Live Hum. Embryo*, 959 So. 2d 210, 214 (Fla. 2007) (upholding a summary that contained language identical to that in the proposed amendment); *Fla. Marriage Prot. Amend.*, 926 So. 2d at 1236-40 (upholding a summary that reiterated almost all of the

sufficient to satisfy the statutory requirements.  For example, in *Wadhams*, we found that even though a ballot contained "the entire section as it would actually appear subsequent to amendment," it still "fail[ed] to contain an *explanatory statement* of the amendment" and thus was "deceptive, because although it contains an absolutely true statement, it omits to state a material fact necessary in order to make the statement made not misleading."  567 So. 2d at 416; *see also Armstrong v. Harris*, 773 So. 2d 7, 15-16, 18 (Fla. 2000).[8]  Nor have we receded from our cases requiring the summary to inform the voter as to material legal effects.  *See Live Human Embryo*, 959 So. 2d at 215.  Sometimes a verbatim summary will capture the material legal effects contained in the amendment.  But sometimes it will not.  *See, e.g., Wadhams*, 567 So. 2d at 416.

---

language contained in the amendment); *Advisory Op. to Att'y Gen. re Med. Liab. Claimant's Comp. Amend.*, 880 So. 2d at 679 (same).

8.  Even where we have upheld a ballot summary, we have still reaffirmed *Wadhams* and its logic, reiterating our precedents against parroting while approving a summary because it "is an accurate description of what the proposed amendment *will do*, consistent with the requirement that ballot language accurately represent the main *legal effect and ramifications of a proposed amendment.*"  *Detzner v. Anstead*, 256 So. 3d 820, 824 (Fla. 2018) (emphases added) (first citing *Armstrong*, 773 So. 2d at 12; and then citing *Wadhams*, 567 So. 2d at 417-18).

Turning to this ballot summary, the vagueness of the proposed amendment itself leaves many key issues undetermined. Thus, as Justice Sasso notes, we ask: "[I]s the Sponsor relieved of its obligation to explain the legal effect of the proposed amendment just because the amendment has no readily discernable meaning?" Dissenting op. at 75-76 (Sasso, J.) Like Justice Sasso, I conclude the answer is no and agree with her detailed analysis that the summary's language fails to convey the amendment's ramifications to the voter.

The majority implies that I am concerned only with "ambiguity in the text of the amendment" itself. Majority op. at 33. That is not so. On the contrary, it is the summary that has failed to adequately explain the amendment. In my view, the summary does not give the voter any clarity on the decision they must actually make or reveal the amendment's chief purpose. Instead, it misleads by omission and fails to convey the breadth of what the amendment actually accomplishes—to enshrine broad, undefined terms in our constitution that will lead to decades of litigation.

A voter may think this amendment simply returns Florida to a pre-*Dobbs* status quo. It does not. A voter may think that a

healthcare provider would be clearly defined as a licensed physician specializing in women's health. It is not. A voter may think that viability falls within a readily apparent time frame. It does not. A voter may think that the comma is an insignificant grammatical tool that would have very little interpretive purpose. It will not. And, critically, the voter may think this amendment results in settling this issue once and for all. It does not. Instead, this amendment returns abortion issues back to the courts to interpret scope, boundary, definitions, and policy, effectively removing it from the people and their elected representatives. Perhaps this is a choice that Floridians wish to make, but it should be done with clarity as to their vote's ramifications and not based on a misleading ballot summary.

To be clear, I do not criticize the content of the proposed amendment itself. The amendment's sponsors may draft an amendment as they see fit. But, contrary to the majority's assessment, it would seem "common sense" that the language a sponsor chooses clearly affects what must be included in the summary to meet the statutory requirements. The sponsor's burden to properly summarize the material legal effects of a

proposed amendment is not lessened by its decision to include undefined terms or broad, abstract language.

Moreover, the breadth of this amendment would likely impact existing constitutional provisions. Article I, section 2, a provision of our constitution's Declaration of Rights, states that "[a]ll natural persons . . . are equal before the law and have inalienable rights," including "the right to enjoy and defend life." Art. I, § 2, Fla. Const.

We have held time and again that a summary must "identify the provisions of the constitution substantially affected by the proposed amendment." *Right of Citizens to Choose Health Care Providers*, 705 So. 2d at 566 (citing *Tax Limitation*, 644 So. 2d at 490). This is required "in order for the public to fully comprehend the contemplated changes." *Id.*[9]

---

9. The requirement that a summary list substantially affected provisions is so embedded in our jurisprudence that some older cases have described it as being rooted in our constitution. *See Fine v. Firestone*, 448 So. 2d 984, 989-90 (Fla. 1984); *Tax Limitation*, 644 So. 2d at 490; *Advisory Op. to Att'y Gen. re Right of Citizens to Choose Health Care Providers*, 705 So. 2d 563, 565-66 (Fla. 1998) (reiterating that "it is imperative that an initiative identify the provisions of the constitution substantially affected by the proposed amendment"); *Advisory Op. to Att'y Gen. re Amend. to Bar Gov't from Treating People Differently Based on Race in Pub. Educ.*, 778 So. 2d 888, 892 (Fla. 2000) (same). More recently, we have found that the modern clarity statute requires the same rule.

The amendment's potential effects on article I, section 2 have present significance, even though we don't have the benefit of a robust body of case law on the topic. That is, the public should be made aware that the scope of the amendment could, and likely would, impact how personhood is defined for purposes of article I, section 2 of our constitution. The voters are owed that "candor and accuracy." *See* majority op. at 27 (quoting *Greyhound*, 253 So. 3d at 520).

I do not deny that the return of abortion policy to the states in the wake of *Dobbs* has resulted in a minefield of potential issues, many of which are "unsettled." Majority op. at 32 n.3. As I previously discussed, citizens have not been asked to contend with these questions in decades. In similar fashion, this Court has failed to address whether the rights guaranteed in article I, section 2 apply to the unborn and, if so, what the scope of those rights could

---

*See Treating People Differently Based on Race*, 778 So. 2d at 898 (rejecting a ballot summary as misleading under section 101.161 because it failed to mention its effect on article I, section 2's nondiscrimination provision; concluding that "the ballot titles are defective because of the misleading negative implication that no such constitutional provision addressing differential treatment currently exists").

be. However, our failure to decide on this issue does not render the provision void. Nor does it alleviate a sponsor's duty to advise the voter of impact. Nowhere has this requirement to inform been arbitrarily limited to substantial effects on issues that this Court has already weighed in on. *Cf. Greyhound*, 253 So. 3d at 523 (evaluating substantial effect on then-recently added article X, section 23, and citing no cases for its interpretation). While a substantial effect would be even more obvious if we had previously addressed this issue, our silence should not eliminate a citizen's right to be informed. If advised of the conflict, the voter could recognize for themselves that, at some level, an amendment providing broad protection for abortion would bear upon constitutional personhood rights as applied to the unborn child. Thus, the voter would be able to consider the choice before them and the decision they must make. *See Fine*, 448 So. 2d at 989. Accordingly, I cannot say that failing to inform voters as to the proposed amendment's impact on article I, section 2 is acceptable.

In summary, Floridians have the right to amend their constitution through the initiative process, and it is an integral part of our state's commitment to responsible citizenship. However,

there are constitutional and statutory requirements that must be satisfied in order for an amendment to reach the ballot. Holding a sponsor to those requirements is far from what the majority characterizes as a "stranglehold on the amendment process." *See* majority op. at 33. Consequently, I find the ballot summary conclusively defective for failing to inform the voter of the material legal effects of the amendment, including the substantial effect this amendment could have on article I, section 2 of our constitution. This conclusion requires me to respectfully dissent from the majority's opinion.

SASSO, J., concurs.

FRANCIS, J., dissenting.

The issue of abortion is incredibly divisive. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022) ("*Roe* [*v. Wade*, 410 U.S. 113 (1973)] 'inflamed' a national issue that has remained bitterly divisive for the past half century. And for the past 30 years, [*Planned Parenthood of Se. Pa. v.*] *Casey* [505 U.S. 883 (1992)] has done the same." (citations omitted)).

When *Dobbs* found there was no *federal* constitutional right to it, the Court "return[ed] the issue of abortion to the people's elected

representatives." *Id.* at 232.  Our elected representatives here in Florida *did* address the issue of abortion legislatively.  *See* §§ 390.011-.0111, .0112, Fla. Stat. (2023).  But those laws have faced legal challenges.

Simultaneously, groups have undertaken the use of the initiative process, *see* art. XI, § 3, Fla. Const., to enshrine abortion in our state constitution.

Today, we are asked to opine on one such effort—an Amendment to Limit Government Interference with Abortion.[10]

As written, the title and the ballot summary (which parrots the amendment) fail to give the voters what they need to make an

---

10.  Specifically, we must determine whether the language of this proposed amendment embraces but one subject, *see* art. XI, § 3, Fla. Const., and whether the ballot summary *explains* the "chief purpose" of the proposed amendment in clear, unambiguous, non-misleading terms, § 101.161(1), Fla. Stat. (2023).  The short ballot title must also be clear, unambiguous, and non-misleading.  Together, the ballot summary and title must " 'provide fair notice of the content of the proposed amendment' to voters so that they 'will not be misled as to [the proposed amendment's] purpose, and can cast an intelligent and informed ballot.' "  *Advisory Op. to Att'y Gen. re Voter Control of Gambling*, 215 So. 3d 1209, 1215 (Fla. 2017) (alteration in original) (emphasis added) (quoting *Advisory Op. to Att'y Gen. re Right of Citizens to Choose Health Care Providers*, 705 So. 2d 563, 566 (Fla. 1998)).

informed decision; thus, both violate the truth-in-packaging law. §
101.161(1), Fla. Stat.

The title fails to communicate to the voters that the purpose of the proposed amendment is ending (as opposed to "limiting") legislative and executive action on abortion, while inviting *limitless* and protracted litigation in the courts because of its use of vague and undefined terms. Just as it played out on the federal stage for over 50 years, the issue of abortion—far from *the people* settling the matter—will continue to be decided by each iteration of this Court.

And the summary hides the ball as to the chief purpose of the proposed amendment: which, ultimately, is to—for the first time in Florida history—grant an almost unrestricted right to abortion.[11]

Because the summary only parrots the language of the proposed amendment, it *explains nothing,* and does not disclose its chief purpose. *See* § 101.161(1), Fla. Stat. The fact that the

---

11. I disagree with the majority's conclusions that "the broad sweep of this proposed amendment is obvious in the language of the summary," majority op. at 19, and that "[t]he ballot title's inclusion of the word 'limit' is . . . not misleading but accurately explains that the Legislature will retain authority to 'interfere[] with' abortions under certain circumstances." Majority op. at 21 (second alteration in original).

language has a "broad sweep," *see* majority op. at 19, as to its "no law" restriction, to me, doesn't end the inquiry. Rather, the sponsor is statutorily and constitutionally required to provide the voter an explanation of the summary's vague language (e.g., as to what constitutes "health" or who may qualify as a "healthcare provider"), as well as tell the voter of the amendment's chief effects. This is not some run-of-the-mill restoration of *Roe*—it goes far beyond that into uncharted territory in this State.

As to the majority's statement that the Court cannot place a "stranglehold" on the initiative process, majority op. at 33, I could not agree more! But this is not that. It is my view that while the constitution enshrines the reserved right of the people to amend their constitution, this Court also has a role in ensuring the people can exercise that right free of anything that would mislead them or present them with ambiguity. *See* art. V, § 3(b)(10), art. IV, § 10, art. XI, § 3, Fla. Const.; § 101.161, Fla. Stat.[12] And quite simply,

---

12. *See supra* note 10.

for the reasons expressed in greater detail here and elsewhere, the summary and title, I submit, don't pass muster.[13]

The effects I discern from the parroted-proposed-amendment summary here—which effects are the best evidence of its chief purpose—are fourfold:

(1) to immediately *abrogate* meaningful abortion laws and restrictions;

(2) to *eliminate* any meaningful, future participation by the Legislature by prohibiting any laws on previability abortions and subjecting any laws regulating postviability abortions to a "healthcare provider's" veto;

(3) to—by eliminating the Legislature's interference—vastly *expand* the right to abortion at any time during pregnancy as a "health" issue for the mother; and

---

13. I also remain convinced that our precedent has read the single-subject requirement far too broadly. However, as I tackle that topic in my dissent in *Advisory Opinion to the Attorney General re Adult Personal Use of Marijuana*, SC2023-0682 (Apr. 1, 2024) (Francis, J., dissenting), I limit my dissent here to the proposal's violation of the truth-in-packaging provisions.

(4) troublingly, to—by ignoring the State's legitimate interests in protecting life—completely *redefine* abortion as a health issue in Florida without saying so.

I address these four effects—that are left unexplained by the summary—in part I, below. And in part II, I further address why the title will mislead voters.

## I. Ballot Summary

### (1)

First, the ballot summary doesn't explain that the scope and immediate impact of the "no law" language is to *abrogate* Florida's current prohibitions, restrictions, and regulations on both pre and postviability abortions. This includes current laws defining viability and drawing the line at a certain number of weeks, §§ 390.011(15), .0111(1), Fla. Stat. (2023); those requiring a sonogram and informed consent, § 390.0111(3), Fla. Stat. (2023); and those prohibiting abortions postviability with limited exceptions. §§ 390.0111(1)(a)-(c), .0112, Fla. Stat. (2023).

The summary also provides that the Legislature can't make laws interfering with a "healthcare provider's" determination that a

late term abortion is medically necessary for the sake of the patient's "health."

"Health" is undefined and, thus, not limited to just life-threatening physical conditions. Rather, "health" could mean anything, really. And "health" seems to include nebulous conditions that could be used to justify a late term abortion. The ballot summary does not explain this.

(2)

Second, the ballot summary doesn't explain that the proposed amendment effectively eliminates the Legislature's ability to pass laws *in the future* regulating abortion in any meaningful, substantive way. This prohibition applies to previability pregnancies. But it applies to postviability pregnancies, too, because the undefined "healthcare provider" gets a veto over any laws the Legislature might be able to pass to protect the unborn as long as said "healthcare provider" decides a "health" issue exists necessitating an abortion.[14] The ballot summary does not explain this.

_____

14. I completely agree with Justice Sasso's excellent dissent concerning the vagueness of the language used by the sponsor,

(3)

Third, the ballot summary doesn't explain that by *eliminating* the Legislature's ability to meaningfully pass laws regulating abortion either pre or postviability, and housing the proposed amendment under Article I's "Declaration of Rights" in the Florida Constitution, the amendment *vastly expands* the right to abortion beyond anything Florida has ever done in the history of the State.

Whatever limits on the "right" to abortion remain are placed squarely in the "healthcare provider's" hands as ultimate decisionmaker.  The ballot summary neither explains nor discloses this.

(4)

Fourth, the summary doesn't explain that the proposed amendment implicitly and completely redefines the abortion issue as a "patient's health" issue without acknowledging **what even *Roe* and *Casey* acknowledged**: the State's compelling interest in

_____

though, *arguendo*, for purposes of my dissent, I assume that the placement of the comma means the worst-case scenario: the "healthcare provider" also determines viability.  *See* dissenting op. at 74-75 (Sasso, J.).

protecting "the potentiality of human life," particularly viable pregnancies. *See Dobbs*, 597 U.S. at 228, 271 (defining "viability" as the ability to survive outside the womb).[15]

While I recognize that our review in ballot initiative cases is narrow, this case is different because abortion is different. *Dobbs*, 597 U.S. at 218 (Syllabus) ("Abortion is different because it destroys what *Roe* termed 'potential life' . . . . None of the other decisions cited by *Roe* and *Casey* involved the critical moral question posed by abortion."). The exercise of a "right" to an abortion literally results in a devastating infringement on the right of another person: the right to live. And our Florida Constitution recognizes that "life" is a "basic right" for "[a]ll natural persons." Art. I, § 2, Fla. Const. One must recognize the unborn's competing right to life and the State's moral duty to protect that life.

---

15. *Roe* found that "in 'the stage subsequent to viability,' which in 1973 roughly coincided with the beginning of the third trimester, the State's interest in the 'potentiality of human life' became compelling, and therefore a State could 'regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" *Dobbs*, 597 U.S. at 271 (citing *Roe*, 410 U.S. at 164-65).

Contrary to what the summary—which parrots the proposed amendment—suggests, abortion is not just about a medical procedure, and it is not just about the rights of women to bodily integrity. "Abortion presents a profound moral issue on which Americans hold sharply conflicting views." *Dobbs*, 597 U.S. at 223.[16] The summary does not address this. Instead, it is a Trojan horse for the elimination of any recognition of the State's interest in protecting what *Roe* termed "potential life."

## II. Title

Based on the four points above, it is clear that the title is also misleading in its use of the term "limit *government* interference." A more truthful title may be "eliminating the Legislature's ability to regulate abortion in any meaningful way."

---

16. "Some believe fervently that a human person comes into being at conception and that abortion ends an innocent life." *Id.* at 223-24. "Others feel just as strongly that any regulation of abortion invades a woman's right to control her own body and prevents women from achieving full equality." *Id.* at 224. "Still others in a third group think that abortion should be allowed under some but not all circumstances, and those within this group hold a variety of views about the particular restrictions that should be imposed." *Id.* at 223-25.

Beyond this, the current title isn't even accurate because it does *not* limit *government* interference: it actively encourages it. This is so because the prohibition on the law- and rule-making authority of the legislative and executive branches does not extend to the judicial branch. In fact, quite the opposite: the summary—which parrots the amendment—reflects multiple undefined terms that *invite* protracted litigation and, thus, *limitless* interference by the *judicial* branch of government.

This is exactly what happened after *Roe*, when abortion was recognized as a fundamental right under the United States Constitution. It led to *50 years* of protracted litigation and to the *courts* continually policing state provisions seeking to protect the lives of both the unborn and their mothers.[17]

---

17. *See, e.g.*, *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976) (blocking Missouri law requiring spousal consent for abortion); *Maher v. Roe*, 432 U.S. 464 (1977) (reversing decision striking a Connecticut law that excluded abortion services from Medicaid coverage); *Colautti v. Franklin*, 439 U.S. 379 (1979) (striking Pennsylvania law requiring physicians to save the life of a potentially viable fetus as unconstitutionally vague); *Harris v. McRae*, 448 U.S. 297 (1980) (upholding federal law proscribing federal funding for abortions except for abortions necessary to either preserve the mother's life or terminate pregnancies resulting from rape or incest); *H.L. v. Matheson*, 450 U.S. 398 (1981) (upholding Utah law requiring parental notification when the

After *Dobbs* returned the abortion issue to the states, both abortion proponents and opponents identified the states as the new abortion battleground and started filing lawsuits in the courts.[18]

patient is a minor living with parents); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416 (1983) (striking portions of Ohio law imposing limitations, such as a waiting period, parental consent without judicial bypass, and a ban on abortions outside of hospitals after the first trimester); *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747 (1986) (striking Pennsylvania law requiring informed consent to include information about fetal development and alternatives to abortion); *Webster v. Reprod. Health Servs.*, 492 U.S. 490 (1989) (upholding Missouri law that required physician viability testing and blocked state funding and state facility participation in abortion services); *Casey*, 505 U.S. 833 (announcing "undue burden" test in landmark case striking portions of Pennsylvania abortion law); *Hill v. Colorado*, 530 U.S. 703 (2000) (upholding Colorado law limiting protest and leafletting close to an abortion clinic); *Stenberg v. Carhart*, 530 U.S. 914 (2000) (striking Nebraska law banning partial birth abortion); *Gonzales v. Carhart*, 550 U.S. 124 (2007) (upholding 2003 federal law banning partial birth abortion).

18.  *See* Center for Reproductive Rights, *New Digital Tool Provides State-by-State Analysis of High Court Rulings on Abortion*, https://reproductiverights.org/state-constitutions-abortion-rights-digital-tool (last visited Mar. 14, 2024) ("Since the U.S. Supreme Court eliminated the federal constitutional right to abortion in its 2022 ruling in *Dobbs v. Jackson Women's Health Organization*, states have become the battlegrounds for abortion rights."); Alliance Defending Freedom, "What You May Not Know: How ADF Helped Overturn *Roe v. Wade*," https://adflegal.org/article/what-you-may-not-know-how-adf-helped-overturn-roe-v-wade (last visited Mar. 27, 2024) ("*Roe v. Wade* has finally been overturned.  But this does not mean the work of the pro-life movement is over—far from it  . . . ."; playing video of ADF CEO, President, and General Counsel Kristen

Those state lawsuits began immediately.[19]  According to the

Brennan Center for Justice's "State Court Abortion Litigation

Waggoner explaining that there are now generally four areas of abortion laws that will be *litigated* post-*Dobbs*: (1) trigger laws (state laws with provisions restricting or prohibition abortion to some degree upon *Roe* being overturned); (2) pre-*Roe* laws limiting abortion; (3) post-*Roe*/pre-*Dobbs* laws stricken under *Roe*; and (4) post-*Dobbs* (new) laws restricting and regulating abortions); Becky Sullivan, "With Roe Overturned, State Constitutions Are Now at the Center of the Abortion Fight," https://www.npr.org/2022/06/29/1108251712/roe-v-wade-abortion-ruling-state-constitutions (last visited Mar. 14, 2024) ("Now, with *Roe v. Wade* overturned, the legal spotlight has shifted to the states, where abortion supporters and opponents must contend with 50 different constitutions that, in many places, guarantee rights more broadly than their federal counterpart."); *see also* David S. Cohen et. al., The *New Abortion Battleground*, 123 Colum. L. Rev. 1, 2–3 (2023) (predicting that "interjurisdictional abortion wars are coming" now that there is no longer a national, uniform abortion right, which will involve intervention by the federal government).

19.  *See* American Civil Liberties Union (ACLU), "Reproductive Rights Organizations Go to Court in 11 States to Protect Abortion Access in Aftermath of Roe v. Wade Falling," https://www.aclu.org/press-releases/reproductive-rights-organizations-go-court-11-states-protect-abortion-access (last visited Mar. 14, 2024) ("This week, following the U.S. Supreme Court's decision to overturn *Roe v. Wade* and eliminate the federal constitutional right to abortion, Planned Parenthood Federation of America (PPFA), the American Civil Liberties Union, and the Center for Reproductive Rights (CRR) took legal action to block abortion bans in 11 states: Arizona, Idaho, Kentucky, Louisiana, Mississippi, Ohio, Oklahoma, Florida, Texas, Utah, and West Virginia.  So far, these efforts have successfully blocked abortion bans in five states—Utah, Kentucky, Louisiana, Florida, and Texas—through

Tracker," "[a]s of January 11, 2024, a total of 40 cases have been filed challenging abortion bans in 23 states, of which 22 remain pending at either the trial or appellate levels."[20] In fact, *Planned Parenthood of Southwest Florida v. State of Florida*, No. 2022-CA-000912 (Fla. 2d Cir. Ct.),[21] is one of the cases filed immediately after *Dobbs* in which abortion proponents succeeded in obtaining a temporary restraining order from a Florida trial court to keep a fifteen-week abortion ban from going into effect.

All of this illustrates that the proposed amendment will not do what the Sponsor and the title say it will do. Instead of limiting *government* interference, it will ultimately encourage a great deal of interference by the judicial branch. So, I must conclude the title is misleading.

---

temporary restraining orders, allowing some providers there to resume abortion care for now."); Becky Sullivan, *supra* note 18 ("The legal chaos has already begun. In a half-dozen states and counting, lawsuits argue that new restrictive abortion laws are in violation of state constitutions.").

20. https://www.brennancenter.org/our-work/research-reports/state-court-abortion-litigation-tracker (last visited Mar. 14, 2024); *see also supra* note 19.

21. Review was granted by this Court in SC2022-1050.

### III. Conclusion

In sum, the Sponsor is required to tell the truth about the purpose and scope of the proposed amendment and not mislead voters; it has done neither.

For these reasons, I dissent.

SASSO, J., dissents with an opinion.

SASSO, J., dissenting.

After a sincere assessment of this case, I conclude that the Sponsor's cut-and-paste approach to preparing the ballot summary fails to satisfy its legal obligation to provide an explanatory statement of the proposal's chief purpose. For that reason, and with the utmost respect for the majority's decision to the contrary, I respectfully dissent.

### I.

This case is somewhat unprecedented. Since this Court first stepped into its role reviewing ballot summaries in the citizen initiative context, we have not been presented with an amendment quite like this. What makes the amendment unique is not its controversial subject matter; this Court has considered controversial amendments before. Instead, it is unique because of

- 65 -

the proposed amendment's overwhelmingly vague and ambiguous language and structure.

In essence, the Sponsor has submitted a proposal with no readily discernable meaning, leaving it up to courts to determine even its most essential legal effects over time. The challenge, then, is to evaluate whether the summary meets the requirements of section 101.161, Florida Statutes (2023), when we have said that in doing so we evaluate "objective criteria inherent in the amendment itself," *Advisory Op. to Att'y Gen. re Citizenship Requirement to Vote in Fla. Elections*, 288 So. 3d 524, 529 (2020) (quoting *Fla. Dep't of State v. Fla. State Conf. of NAACP Branches*, 43 So. 3d 662, 667 (Fla. 2010)), to determine whether or not the ballot title and summary fairly inform the voter of the "true meaning, and ramifications, of an amendment," *Askew v. Firestone*, 421 So. 2d 151, 156 (Fla. 1982). To answer this question, I will explain what our precedent requires,[22] how that applies here, and why my decision is consistent with our role.

---

22. Critical to my determination in this case—no one has argued that our precedent is wrong. No one questions the constitutionality of section 101.161, no one argues that the requirements this Court has applied to ballot summaries do not

II.

A.

When a sponsor submits a constitutional amendment to the voters, section 101.161 imposes on the sponsor the obligation to prepare a ballot summary of the proposed amendment. § 101.161(2), Fla. Stat. The requirements the sponsor must meet in preparing the summary are delineated in section 101.161(1), which provides:

> Whenever a constitutional amendment or other public measure is submitted to the vote of the people, a ballot summary of such amendment or other public measure shall be printed in *clear and unambiguous language* on the ballot after the list of candidates . . . . The ballot summary of the amendment or other public measure shall be *an explanatory statement*, not exceeding 75 words in length, *of the chief purpose* of the measure.

*Id.* (emphases added).

From this text, our Court has derived a few requirements. First, the statute requires an "explanatory statement" of the

---

flow from the statutory text, and no one argues that this Court lacks the authority to prevent ballot summaries that fail to meet those requirements from being submitted to the voters. And while this Court's precedent related to citizen initiatives has been disjointed at best, because no one has argued that even one of this Court's decisions is clearly erroneous, I will do my best in this case to follow the common thread those cases provide.

amendment's chief purpose. That is something distinct from an accurate replication of the proposed amendment. *See, e.g., Wadhams v. Bd. of Cnty. Comm'rs of Sarasota Cnty.*, 567 So. 2d 414, 416 (Fla. 1990).

Second, the ballot summary's explanatory statement must be clear and unambiguous. This means 1) the summary must not mislead the public, and 2) the ballot summary must fairly inform the voter of the chief purpose of the amendment. *See Fla. Dep't of State v. Slough*, 992 So. 2d 142, 147 (Fla. 2008) (quoting *Advisory Op. to Att'y Gen. re Prohibiting State Spending for Experimentation that Involves the Destruction of a Live Hum. Embryo*, 959 So. 2d 210, 213-14 (Fla. 2007)).

And although the term "chief purpose" is undefined in the statute, this Court has filled in the gaps. For decades, this Court has described "chief purpose" to mean "the amendment's chief effect," *Askew*, 421 So. 2d at 155, and even more specifically to mean the "legal effect of the amendment," *Evans v. Firestone*, 457 So. 2d 1351, 1355 (Fla. 1984); *see also Advisory Op. to Att'y Gen. re All Voters Vote in Primary Elections for State Legislature, Governor, & Cabinet*, 291 So. 3d 901, 913 (Fla. 2020) (Muñiz, J., dissenting)

- 68 -

("[T]he 'chief purpose' of the amendment can be understood in terms of the subset of those legal effects that would be material to a reasonable voter.").

In doing so, we have clarified that a sponsor "need not explain every detail or ramification of the proposed amendment." *Advisory Op. to Att'y Gen. re Amend. to Bar Gov't from Treating People Differently Based on Race in Pub. Educ.*, 778 So. 2d 888, 899 (Fla. 2000) (quoting *Advisory Op. to Att'y Gen. re Prohibiting Pub. Funding of Pol. Candidates' Campaigns*, 693 So. 2d 972, 975 (Fla. 1997)). Even so, "drafters of proposed amendments cannot circumvent the requirements of section 101.161, Florida Statutes, by cursorily contending that the summary need not be exhaustive." *Id.*; *see also Dep't of State v. Fla. Greyhound Ass'n*, 253 So. 3d 513, 520 (Fla. 2018) (a ballot summary that fails to inform the voter of an amendment's "material effects" is defective).

Together, these requirements serve a greater purpose than guaranteeing the sponsor fulfills technical rules. Section 101.161 ensures that "[t]he voter should not be misled and . . . [will] have an opportunity to know and be on notice as to the proposition on which he is to cast his vote." *Wadhams*, 567 So. 2d at 417

(omission in original) (quoting *Hill v. Milander*, 72 So. 2d 796, 798 (Fla. 1954)).  In other words, to make an informed decision, the voter must know the "true meaning, and ramifications, of an amendment." *Askew*, 421 So. 2d at 156.

B.

Giving effect to these requirements, this Court has never hesitated to hold a sponsor to its statutory obligations.  And this has been true particularly when presented with ballot summaries that contain vague and ambiguous language, even when that language closely mirrors the underlying proposal.

For example, in *Askew*, a ballot summary closely followed the text of a proposed amendment that would prohibit former state officers from lobbying without disclosing financial interests.  421 So. 2d at 153.  This Court still found the summary misleading because it neglected to advise the public of an existing two-year lobbying ban that did not require financial disclosures.  *Id.* at 155.  We concluded that "[t]he problem, therefore, lies not with what the summary says, but, rather, with what it does not say."  *Id.* at 156.  "[S]uch a change must stand on its own merits and not be disguised as something else."  *Id.*

And in *Wadhams*, similar to the Sponsor here, the amendment's proponents simply provided the text of the amendment without a summary. 567 So. 2d at 415. The Court held that a summary explaining the effects of the amendment was necessary, concluding:

> The problem with the ballot in the present case is much the same as the problem with the ballot in *Askew*. By containing the entire section as it would actually appear subsequent to amendment, rather than a summary of the amendment to the section, the ballot arguably informed the voters that the Charter Review Board would only be permitted to meet once every four years. By failing to contain an *explanatory statement* of the amendment, however, the ballot failed to inform the public that there was presently no restriction on meetings and that the *chief purpose* of the amendment was to curtail the Charter Review Board's right to meet. Similar to the ballot summary at issue in *Askew*, the present ballot "is deceptive, because although it contains an absolutely true statement, it omits to state a material fact necessary in order to make the statement made not misleading."

*Id.* at 416 (quoting *Askew*, 421 So. 2d at 158 (Ehrlich, J., concurring)).

In similar fashion, in 2018 a majority of this Court concluded that "it is not sufficient for a ballot summary to faithfully track the text of a proposed amendment." *Detzner v. League of Women Voters of Fla.*, 256 So. 3d 803, 811 (Fla. 2018). With that rule guiding its

analysis, this Court held that a ballot summary was defective for failing to explain the phrase "established by" because that phrase "is neither commonly nor consistently used" and therefore "cannot be commonly understood by voters." *Id.* at 809-10. Likewise, we determined the ballot summary failed to explain the categories of schools that would be affected by the proposal and therefore "voters will simply not be able to understand the true meaning and ramifications of the revision," so "the ballot language [was] clearly and conclusively defective." *Id.* at 810.

This Court has also, at times, determined that ballot summaries fail when specific terms are left undefined. *See, e.g., Advisory Op. to Att'y Gen. re People's Prop. Rts. Amends. Providing Comp. for Restricting Real Prop. Use May Cover Multiple Subjects*, 699 So. 2d 1304, 1308-09 (Fla. 1997) (failure to define "owner," "common law nuisance," and "in fairness" in the summary, even though those terms were properly replicated from and also undefined in the text of the proposed amendment, caused the amendment to be stricken from ballot); *Race in Pub. Educ.*, 778 So. 2d at 899-900 ("[T]his Court has repeatedly held that ballot summaries which do not adequately define terms, use inconsistent

terminology, fail to mention constitutional provisions that are affected, and do not adequately describe the general operation of the proposed amendment must be invalidated."); *Smith v. Am. Airlines, Inc.*, 606 So. 2d 618, 621 (Fla. 1992) (observing the statutory word limit "does not give drafters of proposed amendments leave to ignore the importance of the ballot summary and to provide an abbreviated, ambiguous statement in the hope that this Court's reluctance to remove issues from the ballot will prevent us from insisting on clarity and meaningful information").

Of course, I recognize this Court did not deem any of those ballot summaries defective *because* they parroted language. Instead, the best I can do to synthesize our cases is to conclude that this Court has considered ballot summaries defective where, despite parroting, the summary either misled by omission, failed to explain the material ramifications of the amendment, or resulted in a disconnect between the operative meaning of a term and a voter's understanding of it.

III.

So, how do these principles apply here?

A.

The Sponsor argues that this Court's cases referenced in section II(B) are inapplicable because there is no ambiguity in the amendment. It argues that the terms "viability," "healthcare provider," and "patient's health" all have clear meanings that are obvious to voters. Similarly, the Sponsor argues that the comma placed between "patient's health" and "as determined by the patient's healthcare provider" means that the term "viability" used earlier in the amendment is also modified by the phrase "as determined by the patient's healthcare provider." This too, says the Sponsor, is clear and obvious to the voter because of common rules of grammar.

The Sponsor is just plain wrong. None of those terms have any sort of widely shared meaning,[23] nor do I think the comma

_____

23. "Health" and "healthcare provider" have obviously broad and undefined boundaries which are seemingly unlimited without the benefit of a technical, legal analysis. As for "viability," "[t]his arbitrary line has not found much support among philosophers and ethicists . . . . The most obvious problem with [relying on or attempting to define viability] is that viability is heavily dependent

- 74 -

accomplishes what the Sponsor says it does.[24]  So if the ballot summary is sufficient in this case, it is not for the reasons the Sponsor has presented to this Court.

B.

The more difficult question is whether the ballot summary is sufficient because it parrots the proposed amendment, which itself is vague and ambiguous.  In other words, is the Sponsor relieved of its obligation to explain the legal effect of the proposed amendment just because the amendment has no readily discernable meaning?

In my view, the answer is no.  I agree with the majority that, at

---

on factors that have nothing to do with the characteristics of a fetus."  *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 275-76 (2022).

24.  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012), a treatise devoted to the interpretation of legal text, identifies the application of the series qualifier canon as "highly sensitive to context."  *Id.* at 150.  This sensitivity to context is exemplified in Justice Alito's concurrence in *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021), where he lays out several examples of sentences that go against the canon.  And so, application of the series qualifier canon is not so straightforward that all reasonable Florida voters will mechanistically apply this arcane rule and discover that, "indeed, 'as determined by the patient's healthcare provider' also modifies 'viability.' "  *See id.* at 413 (Alito, J., concurring) ("No reasonable reader interprets texts that way.").

a very high level, the voters will understand that this amendment creates a broad right to abortion in Florida. However, our precedent has consistently required that the summary explain more than the amendment's general aim. Indeed, we have said that ballot summaries must explain the "material legal effect," so that the electorate is advised of the "true meaning, and ramifications, of an amendment" and is thereby "adequately informed."

The summary here does none of this. Instead, it leaves the legally operative terms that define the amendment's scope ("viability," "health," and "healthcare provider") up in the air. Likewise, the summary does not attempt to explain that the amendment itself is similarly vague and ambiguous, nor do I believe that this fact is self-evident from the vague and ambiguous nature of the summary.

What we are left with, then, is a summary that does not attempt to explain the amendment's material legal effects and employs terms that are neither consistently nor commonly understood. As a result, I find it much more likely that this summary will mislead voters into committing the same error the Sponsor did in its briefing to this Court: they will carry their

- 76 -

personal conception of the amendment's meaning into the voting booth, operating under the assumption that their particular interpretation is widely understood. Similarly, I find it highly unlikely that voters will understand the true ramifications of this amendment—that they will read the ballot summary and vote based on an informed understanding and acceptance of the uncertainties posed by its vague and ambiguous language.

For that reason, I believe this case better fits with those decisions in which we concluded that ballot summaries were defective, rather than those relied upon by the majority. *See, e.g.*, *Race in Pub. Educ.*, 778 So. 2d at 899 (concluding an undefined term left "voters to guess at its meaning. . . . [V]oters would undoubtedly rely on their own conceptions of what constitutes a bona fide qualification," and that the summary violated section 101.161); *League of Women Voters*, 256 So. 3d at 811; *People's Prop. Rts. Amends.*, 699 So. 2d 1304; *Askew*, 421 So. 2d 151.[25]

_____

25. The closest cases cited by the majority to this one are *Advisory Opinion to the Attorney General re Medical Liability Claimant's Compensation Amendment*, 880 So. 2d 675 (Fla. 2004), and *Advisory Opinion to the Attorney General re Florida Marriage Protection Amendment*, 926 So. 2d 1229 (Fla. 2006). I find *Medical Liability* distinguishable because the chief purpose of the

And so, I conclude the Sponsor has failed to prepare a ballot summary that meets the requirements of section 101.161 as previously interpreted by this Court.

IV.

I will end by briefly touching upon one point in the majority opinion. The majority argues that if we conclude the summary is defective due to its vague and ambiguous nature, we may be inadvertently imposing a substantive limitation on what types of amendments can be proposed via the citizen initiative process. While I do not think this concern is totally unfounded, I also think the concern is more for the legislature than the judiciary.

Again, no one challenges the constitutionality of section 101.161, and no one challenges this Court's precedent interpreting it. If a sponsor cannot fulfill its statutory obligation because its

---

amendment was still communicated to the voter despite the undefined term. I find *Marriage Protection Amendment* distinguishable because the meaning of the undefined terms was clear to the ordinary voter. Likewise, I do not think *Advisory Opinion to the Attorney General re Voter Control of Gambling*, 215 So. 3d 1209 (Fla. 2017), provides helpful guidance because the undisclosed ambiguous legal effect in that case was retroactivity— not a legal effect that constituted a pillar of the amendment's scope, like viability, health, and healthcare provider here.

proposed amendment is too vague and ambiguous to explain, I believe the statute places the burden of that bargain with the sponsor—not the voters. *See Smith*, 606 So. 2d at 621 ("[T]he burden of informing the public should not fall only on the press and opponents of the measure—the ballot title and summary must do this." (quoting *Askew*, 421 So. 2d at 156)).

And that is what happened here. The Sponsor has made no attempt to "explain" the material legal effects of the proposed ballot amendment as required by section 101.161. Instead, the Sponsor has punted, leaving the legal effect to be revealed by the eye of the beholder. The Sponsor's statutory obligation, as explained by this Court's precedent, demands more. As a result, I respectfully dissent.

GROSSHANS and FRANCIS, JJ., concur.

Original Proceeding – Advisory Opinion – Attorney General

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, Jeffrey Paul DeSousa, Chief Deputy Solicitor General, Daniel W. Bell, Chief Deputy Solicitor General, Nathan A. Forrester, Senior Deputy Solicitor General, John M. Guard, Chief Deputy Attorney General, and James H. Percival, Chief of Staff, Office of the Attorney General, Tallahassee, Florida,

    for Petitioner

Mathew D. Staver, Anita L. Staver, Horatio G. Mihet, and Hugh C. Phillips of Liberty Counsel, Orlando, Florida,

    for Interested Party, Florida Voters Against Extremism, PC

Stephen C. Emmanuel of Ausley McMullen, Tallahassee, Florida,

    for Interested Party, Florida Conference of Catholic Bishops, Inc.

Alan Lawson, Samuel J. Salario, Jr., Jason Gonzalez, and Caroline May Poor of Lawson Huck Gonzalez, PLLC, Tallahassee, Florida,

    for Interested Party, Susan B. Anthony Pro-Life America

Jeremy D. Bailie and R. Quincy Bird of Weber, Crabb & Wein, P.A., St. Petersburg, Florida,

    for Interested Party, National Center for Life and Liberty

Quinn Yeargain of Widener University Commonwealth Law School, Harrisburg, Pennsylvania; and Mark Dorosin of Florida A&M University College of Law, Orlando, Florida,

    for Interested Parties, Law Professors & Instructors

Joshua A. Rosenthal and Aadika Singh of Public Rights Project, Oakland, California; and Matthew A. Goldberger of Matthew A. Goldberger, P.A., West Palm Beach, Florida,

    for Interested Parties, Current and Former Florida Republican Elected Officials

Kelly O'Keefe and Hannah Murphy of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Tallahassee, Florida, and Abby G. Corbett and Jenea E. Reed of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, Florida; Stephen Petkis, Judy Baho, Kendall J. Christie, and Aubrey Stoddard of Covington & Burling LLP, Washington, District of Columbia; Isaac D. Chaput of

Covington & Burling LLP, San Francisco, California; and Vanessa J. Lauber of Covington & Burling LLP, New York, New York,

for Interested Parties, Florida Doctors

Michelle Morton, Daniel B. Tilley, and Nicholas Warren of American Civil Liberties Union Foundation of Florida, Miami, Florida; and Courtney Brewer, Tallahassee, Florida,

for Interested Party, Floridians Protecting Freedom

Carrie Flaxman and Skye Perryman of Democracy Forward Foundation, Washington, District of Columbia; and Sean Shaw of Swope, Rodante P.A., Tampa, Florida,

for Interested Party, American College of Obstetricians and Gynecologists